No. 80-160

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

_____

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

ANTHONY RODRIGUEZ,

Defendant and Appellant.

_____

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone.
Honorable Diane G. Barz, Judge presiding.

Counsel of Record:

For Appellant:

Moses Law Firm, Billings, Montana
Michael Moses argued, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
John Maynard argued, Assistant Attorney General, Helena,
Montana
Harold F. Hanser, County Attorney, Billings, Montana
Robert Waller argued, Deputy County Attorney, Billings,
Montana

_____

Submitted: November 17, 1980

Decided: April 20, 1981

Filed: APR 20 1981

_____
Thomas J. Kearney
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Anthony Rodriguez appeals his conviction of deliberate homicide following a jury trial in the Yellowstone County District Court. He was sentenced to a term of 40 years imprisonment.

The defendant challenges the transfer of his case from Youth Court to District Court, the sufficiency of the evidence to convict him, and the trial court instructions to the jury on the statutory mental states "purposely" and "knowingly." In addition, he raises several collateral issues relating to pretrial matters. We affirm.

Early on the evening of July 14, 1979, Rodriguez, age 17, entered Al's Tavern in Billings, Montana, accompanied by Tommy Garcia, age 27. Mike Lave, age 43, was seated at the bar next to the decedent Clarence Bickerstaff, age 53. According to the defendant, Lave pointed at him, told him to leave, and shoved him out the door. Garcia left with Rodriguez.

Rodriguez returned a short time later with his uncle, Jimmy Joe Nava, Garcia, and a third man, Dean Hodges. The bartender, Joe Chavez, ordered Nava to get out of the bar because he was not welcome there. Chavez, assuming that Nava, Rodriguez and their companions would leave, turned his back on them while getting beer from the bar cooler. In that instant, a fight broke out between Nava and Lave. How the fight started and who started it is disputed.

As Clarence Bickerstaff, who had been seated next to Mike Lave at the bar, started to get off his stool, the defendant grabbed him. The two fell to the floor. Bickerstaff wound up lying on his back on the floor. Rodriquez was on top of him with his knees straddling Bickerstaff's chest.

Garcia and David Lave (Mike Lave's brother) testified that they saw defendant grab Bickerstaff by the hair and beat his head several times against the concrete floor. Defendant testified that he grabbed Bickerstaff to prevent him from attacking Nava (Rodriquez's uncle) who was fighting with Mike Lave, and that he and Bickerstaff "slipped" to the floor. He contends that he grabbed Bickerstaff on both sides of the collar and hit the back of the victim's head on the floor three times while Bickerstaff fought back with his fists.

David Lave testified that he saw blood "gushin" from Bickerstaff's head. After the fight was over, Lave testified that Bickerstaff lay lifeless in a pool of blood on the floor. He was rushed to the hospital where he underwent surgery for epidural hematoma. Brain wave studies conducted by the hospital indicated cerebral death. The artificial respirator was disconnected and Bickerstaff died. At trial, Dr. Schwidde, M.D., testified that the victim had died from severe wounds to the head and the brain.

On July 24, 1979, defendant voluntarily surrendered to the authorities. He was placed in jail, but was not taken before the magistrate until some 20 days later. In the meantime, on July 31, 1979, the State filed a motion with the District Court to transfer prosecution of the case from Youth Court to District Court. He appeared before the Justice of the Peace on August 13, 1979, the day the District Court heard the State's transfer motion. Before this hearing, counsel for the defendant would not permit the defendant to be interviewed by a Youth Court Probation Officer or to be examined by a psychologist. On September 5, 1979, the District Court granted the motion and ordered defendant to be tried

-3-

as an adult.

The District Court set bail at $25,000, but specified, over defense objections, that at least $10,000 had to be in cash.

We first consider whether the defendant's case was properly transferred from Youth Court to District Court. Upon advice of his lawyer, defendant refused to consent to an interview with either the Youth Court Probation Officer or with a psychologist. Therefore, the probation officer could not recommend for or against a transfer, and so advised the District Court. Defendant contends that in ordering the cause to be transferred, the District Court relied on the fact that defendant refused to be interviewed, and therefore, that the court placed the burden on him to justify the continuation of his case in Youth Court. Placing this burden on him, he claims, would force him to waive his right against self-incrimination.

That is not the case here. The District Court did not, in ordering transfer of the case from Youth Court, rely on the fact that defendant refused the interviews. Rather, he based his determination on consideration of the statutory factors set out in section 41-5-206(1), MCA, which provides the framework for consideration of transfers from Youth Court to District Court.

Under this statute, the Youth Court may transfer prosecution of a criminal homicide to District Court, if the youth is at least 16 years old. The statute also requires that the District Court must find reasonable grounds to believe: (1) that the youth committed the alleged act; (2) that the seriousness of the offense and protection of the community require treatment of the youth beyond that afforded by

juvenile facilities; and (3) that the alleged offense was committed in an aggressive, violent, or premedicated manner. Section 41-5-206(1)(d), MCA.

In addition to these requirements, section 41-5-206(2), MCA, directs the court, in reaching its decision to consider: (a) the sophistication and maturity of the youth; (b) the youth's past record and history; and (c) the prospects for adequate rehabilitation of the youth through the facilities at the disposal of the Youth Court and the prospect for adequate protection of the public.

The District Court memorandum, which accompanied the transfer order, considered all of the factors in section 41-5-206(1)(d) and (2), MCA. The court considered each of the three factors in section 41-5-206(1)(d) and found that they mandated transfer to District Court. The court considered each of the factors in section 41-5-206(2). Nothing in the record indicates that the Youth Court transferred the defendant's case to District Court because the defendant refused to submit to interviews and examinations. To the contrary, the case was transferred based on evidence and considerations independent of defendant's refusal to be interviewed or examined.

It is true that the Youth Court did not make specific findings of fact and perhaps that is the preferable practice. But it is sufficient if the record shows that each factor was seriously considered. In Re Stevenson (1975), 167 Mont. 220, 538 P.2d 5. We will not assume, based on the bald allegation of the defendant, that his cause was transferred to District Court in retaliation for his refusal to cooperate with the Youth Court judge in consenting to the interviews. Once the Youth Court was refused access to the requested

-5-

interviews, the only source of information he could rely on was that coming from other than the defendant. The record shows that in doing so, the trial court considered each of the factors set out in section 41-5-206.

Defendant next contends that the evidence fails to show beyond a reasonable doubt that he caused the victim's death. Although he admits slamming the victim's head against the floor, he claims he only slammed the back of the victim's head against the floor, and therefore he could not have caused the victim's death because medical evidence established that the cause of death came about from blows to the side of the victim's head (the right eye and right ear). Defendant claims there is no direct evidence that he struck the victim on the side of his head or near his eye. Further, he argues that it would have been physically impossible for him to turn the victim's head so far to the side that the right eye and right ear were slammed against the floor. It follows, defendant insists, that he could not have killed the victim. He speculates that the fatal blow was inflicted by a flying pool stick or barstool. He concludes that at the very least there/a was reasonable doubt that he inflicted the fatal blow.

Defendant's view is based on his claim that the evidence shows only that he slammed the back of the victim's head against the floor. We need not confine ourselves to defendant's view of the evidence, however. Defendant admitted, and several witnesses testified, that he slammed the victim's head against the floor. The testimony of these witnesses was not qualified by a declaration that they saw defendant slamming only the back, and not the side, of the victim's head against the concrete floor.

Nor can we take judicial notice, as defendant asks us to do, that it was physically impossible for him to inflict the lethal blow to the side of the victim's head. This

-6-

claimed physical impossibility is not "within the common knowledge of us all" as the defendant insists. To take this kind of judicial notice, we would be required not only to possess anatomical expertise that we do not have, but also to invade the province of the jury to decide the facts based on the evidence before them.

The evidence is sufficient to permit any rational trier of fact to find that defendant inflicted the deadly blow or blows. See, Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; State v. Duncan (1979), ____ Mont. ____, 593 P.2d 1026, 1030, 36 St.Rep. 748. But the evidence does not unequivocally establish that defendant/sitting on the victim's shoulders or was in any way preventing the victim's head from being twisted, as it was repeatedly slammed onto the concrete floor. The evidence presented a jury question to determine if the defendant had caused the victim's death. The jury found that he had.

Defendant next argues that the statutory definitions of "purposely" and "knowingly" contained in the deliberate homicide statute are constitutionally deficient because they allow conviction of deliberate homicide on less than a specific intent to kill. We have previously considered and rejected that argument. See, State v. Coleman (1979), ____ Mont. ____, 605 P.2d 1000, 1054-1056, cert.den., ___ U.S. ____, 100 S.Ct. 2952, 64 L.Ed.2d 831. The jury was given the instructions which we upheld in Coleman. We again uphold them today.

Defendant also raises several issues on pretrial matters. He claims that he was not brought to a magistrate "without unnecessary delay" within the meaning of section 46-7-101, MCA; he claims that the District Court could not lawfully

require that he post a $10,000 cash bond in addition to posting a $15,000 bond in another fashion; and he claims that he was denied due process because the trial court denied his request that he attend a preliminary hearing without handcuffs and prison garb. Defendant has in no way shown that he was prejudiced at trial because of any claimed error, and for this reason alone, we reject his contentions.

Section 46-7-101, MCA, expressly requires a defendant to be brought to a magistrate for an initial hearing "without unnecessary delay." Under sections 41-5-301, et seq., MCA, of the Youth Court Act, a juvenile need not be brought immediately before a judge for an initial appearance. Although defendant has shown us no prejudice because of this lapse of 20 days before his arraignment, we nonetheless strongly disapprove of any deliberate attempt by the State to avoid an arraignment "without unnecessary delay" by first arresting and holding a juvenile under the Youth Court Act for a sustained period of time, and then later attempting to prosecute the juvenile as an adult. We will, in the future, closely scrutinize these situations. If the defendant can show prejudice or a deliberate attempt by the prosecution to circumvent a speedy arraignment, we will not hesitate to fashion an appropriate remedy. See, for example, State v. Benbo (1977), 174 Mont. 252, 570 P.2d 894.

The defendant next argues that in ordering that his $25,000 bail bond be comprised of $15,000 by the normal surety method, and $10,000 in cash, the District Court violated 1972 Mont. Const, Art. II, § 21 and section 46-9-401, MCA. The constitutional provision states that "[a]ll persons shall be bailable by sufficient sureties, . . ." The statute provides in pertinent part that a defendant may

also furnish bail by real estate or by written undertaking. In application to defendant, that issue is now moot. In the future, we will closely scrutinize a requirement that a defendant post all or a substantial part of the bail in the form of cash. Rarely can a defendant obtain the cash and the danger is that a cash bail requirement will effectively prevent a person from being free on bail pending trial.

A cash bail requirement may also effectively undermine the constitutional guarantee of bail by "sufficient sureties" and the statutory provision of section 46-9-102, MCA, that "[a]ll persons shall be bailable before conviction . . ." This may well deprive a person of his liberty before trial and clash with the presumption of innocence, a cornerstone of our judicial system.

Although trial courts have discretion in setting bail, as an appellate court we must have a way of determining why a certain form and amount of bail was set. That is particularly true in the case of cash bail. If a trial court believes that it must set a cash bail, we require that the court make specific findings to this effect, and that the findings be included in the record for purposes of review. It is the duty of the trial courts to give us a record to review.

Defendant next claims that he is entitled to a new trial because the trial court refused his motion that he be permitted to attend his preliminary hearing without handcuffs and without prison clothes. But defendant has not shown that his right to a fair trial has been prejudiced. In fact, it was not until the hearing of this appeal that defendant first claimed prejudice--an undocumented claim that television cameramen had been present at the preliminary hearing and

that pictures of the defendant in handcuffs and in jail clothing had been televised in the Billings area that night. But during questioning from the bench, defense counsel could not remember that potential jurors had even been questioned about their knowledge of the television broadcast. The record, therefore, fails to show any prejudice to defendant.

Although we find no prejudice here, we remind the trial courts that they have a duty to avoid potential prejudice caused by the appearance of a defendant at trial or during preliminary appearances. We have opened up the courts to the news media, including picture taking and television cameramen. With this goes the chance that pretrial publicity, including pictures of a defendant in jail or prison clothes and handcuffed, can affect his right to a fair trial. The defendant is presumed innocent and it is demeaning to haul him into court in jail clothes and handcuffed. Surely other arrangements can be made when defendants who are still in custody must appear in court. This Court has seen pictures of defendants in jail clothes and in handcuffs displayed on the front pages of major newspapers in this state. We have given the news media the right to take the pictures, but we have not given the trial courts the right to require the defendant to appear in jail clothes and handcuffed. We urge the trial courts to stop this practice and to order the custodial officials to bring defendants into court dressed in their own clothes and not handcuffed. The inconveniences to the custodial officials cannot override the defendant's right to fair treatment when appearing in court.

Defendant has not, however, shown how he was prejudiced at his trial because of the operation of these rules. We

-10-

are too busy to enter into lengthy legal discussions when the defendant's right to a fair trial has not been infringed in any way.

The judgment of the District Court is affirmed.

_Daniel J. Shea_
                                        Justice

We Concur:

_Frank L. Haswell_
Chief Justice

_John Conway Harrison_

_John C. Sheehy_

_Gene B. Daly_
Justices