No. 80-291

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

DONALD E. WILSON,

Defendant and Appellant.

---

Appeal from: District Court of the Fourth Judicial District,
In and for the County of Missoula.
Honorable John Henson, Judge presiding.

Counsel of Record:

For Appellant:

Hood and Sherwood, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Robert Deschamps III, County Attorney, Missoula, Montana

---

Submitted on briefs: April 2, 1981

Decided: July 2, 1981

Filed: JUL 6 1981

_Thomas J. Kearney_
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Defendant Donald Earl Wilson appeals from his conviction by a jury on the charges of felony burglary and misdemeanor forgery, rendered after trial in the District Court of the Fourth Judicial District, Missoula County, the Honorable John S. Henson, presiding. The defendant was sentenced to serve eight years at hard labor in the State Prison on the felony burglary charge and six months in the Missoula County jail on the misdemeanor forgery charge, the sentences to run concurrently.

Both parties recommend that the misdemeanor conviction be reversed, based on this Court's decision in State ex rel. Rasmussen v. District Court (1980), ____Mont.____, 615 P.2d 231, 37 St.Rep. 1498. That case held that district courts do not have jurisdiction over misdemeanor charges otherwise provided for, citing section 3-5-302(1)(d), MCA; jurisdiction over misdemeanors punishable by a fine not exceeding $500 and/or imprisonment not exceeding six months was found to be given to justice courts under section 3-10-303(1), MCA. Rasmussen, 615 P.2d 231, 232, 37 St.Rep. 1499; State v. Campbell (1981), ____Mont.____, 622 P.2d 200, 202, 38 St.Rep. 19, 21-22. Misdemeanor forgery is punishable within the above-stated limits. Section 45-6-325(4), MCA. Therefore, the District Court did not have jurisdiction to try the charge. Defendant's misdemeanor forgery conviction must be reversed, his sentence vacated, and the charge dismissed.

Defendant presents the following issues concerning the burglary conviction:

1. Whether the trial court erred in denying defendant's motion in limine and allowing the prosecution to inquire into the defendant's exercise of his Miranda rights to remain silent?

2. Whether the District Court erred in refusing to grant defendant's motion for a mistrial after the prosecution had violated an order in limine prohibiting the prosecution from inquiring into or soliciting any hearsay testimony with respect

to things said by Anna Doney to investigating officers?

3. Whether there was sufficient evidence to convict the defendant of burglary?

We affirm the defendant's conviction.

The undisputed facts include the following: The home of Patrick and Gwen Thibodeau was burglarized while they were away on vacation during June and July of 1978. The owners returned home on July 15, and found the side door ajar. Mr. Thibodeau discovered that his checkbook was missing at that time.

At a later date, when the couple's account statement and cancelled checks arrived from the bank, they discovered a check written to Shaffer's Market in Missoula in the amount of $79.50, which neither had issued. The check was endorsed on the back in the defendant's name. After inquiring about the check at Shaffer's Market, the couple contacted the police, and then further searched their home. They discovered that eight 1879 silver dollars, a watch and a gold ring were also missing. The watch and ring were later recovered by police at the residence of one Anna Doney. The defendant had given the items to Doney's children.

Defendant was arrested near Glasgow in December 1978. He was charged by information with felony burglary and misdemeanor forgery. Defendant pleaded not guilty to each. Trial was held on January 3 and 4, 1980.

At trial, a store clerk from Shaffer's Market testified that he had cashed the subject check on June 24, 1978, for the defendant; and, that the defendant stated at the time, first, that Thibodeau had given the check to the defendant in payment for work which he had done on Thibodeau's ranch, and second, that defendant had asked Thibodeau to make the check payable to Shaffer's Market because the banks were closed that day and because the defendant intended to cash it at the store. The clerk testified that defendant had used part of the money

- 3 -

received to pay a bill owed by one Judy Crosby and part to buy groceries, and the rest he had received in cash. The clerk further testified that a few weeks prior to trial defendant had returned to the store to discuss the check; the defendant stated the check had been given to him in payment for a truck sold by the defendant, that the check had been made out by another person in the store in front of the clerk, and that the defendant knew 40 witnesses who could testify to that effect. The clerk testified the defendant wanted to know why the clerk did not like him.

Defendant testified at trial to his version of events. According to his testimony, he had been living at the home of Judy Crosby. He had vehicles parked in the yard. One, a 1966 Ford, he sold to a man named Levi after Judy Crosby had stated that she wanted the vehicle moved. Levi wanted the car for parts. The sale price was $75. Defendant helped Levi tow the car away. Levi promised to pay at some later date. The defendant did not know the man by any other name.

Defendant testified that he did not see Levi again for several weeks, until Saturday, June 24, when he noticed Levi in a city park. Defendant approached Levi to demand payment. Levi stated that he could go and get the money, and asked to borrow the defendant's car. The defendant agreed, on the condition that Levi pay for the gas he would use, and lent Levi his white Ford station wagon.

The defendant testified that Levi returned approximately two hours later with the subject check. Defendant and Levi then went to Shaffer's Market to cash the check. Levi wrote the check in either the car or the store, in the amount of $79.50, which included $4.50 for the gas he had used. Because the defendant did not know Levi's real name, he had no reason to suspect that Levi was not Patrick Thibodeau.

The defendant testified that he and Levi presented the check to the clerk. The defendant produced his chauffeur's

license, and endorsed the check on the back with his name and address.

The defendant further testified that several weeks after June 24, he found the watch and gold ring between the seats of his white Ford wagon, the one that Levi had used. The defendant thought the items were junk and gave them to the children of Anna Doney, whose family were friends with the Crosbys.

The defendant testified that he continued to frequent Shaffer's Market until he got a job moving houses in North Dakota. He phoned the Crosby residence after he had moved, and was informed that there were problems with the check. He directed Judy Crosby to contact the police and find out what was going on. When the defendant called back, Judy Crosby told him the check was no good and the police were interested in talking to him.

The defendant testified that he immediately set out to return to Missoula. In Glasgow, he needed gas but had run out of money. He stopped at the Glasgow Police Department to ask for help, and told them that he had to get to Missoula to straighten out a legal problem. He was given ten gallons of gas, but was then stopped and arrested a short distance outside of Glasgow.

After the defendant was returned to Missoula, he was released on bail. He never was able to locate Levi. He testified that on his return to Shaffer's Market to straighten out the dispute the clerk acted "snotty" and "sarcastic" towards him.

Appellant's Issue One. As part of its cross-examination of the defendant, the State asked whether defendant had ever discussed the check with any police officers, either in Glasgow or Missoula, in an attempt to rectify the matter. Defendant objected and, in chambers, moved for an order in limine to prevent the State from asking any questions which might reflect or comment upon defendant's exercise of his Miranda right to remain silent. The Court denied the motion on the grounds that defen-

dant had opened the area himself upon direct.

The court and counsel then returned to the courtroom and the prosecutor, after reviewing with defendant his testimony on direct examination, elicited the following:

"Q. Did you ever talk to anyone to get the matter straightened out then? A. No. I never got back here.

"Q. So then you never gave anyone, you never talked to anyone to clear the matter up, then? A. No, sir."

Defendant includes, as part of this issue, two statements made by the prosecutor during closing argument, as follows:

1. "Then, we hear from Allen Kimery again . . . Allen Kimery attempts to locate people down there to find out if anyone else knows of this Levi. The first we have heard of Levi was yesterday, and had we known about this mysterious Levi first or before, then, we would have attempted to locate him to have him here. So we go to the Bonner area through Al Kimery and check out and see if anyone knows this Levi. Nobody but the Defendant and Jim Gates and their witnesses have ever heard of Levi." (Emphasis added.)

2. "When [defense counsel] began to address you, he told you about the State having the resources of the sheriff's department and whatever. One thing he did not tell you at that time was that the sheriff's department serves the subpoenas for both the State and the Defendant. Another thing he did not tell you is whether or not he issued a subpoena for Mr. Levi when he has that sheriff's department available as a resource to him to attempt to locate this Mr. Levi or Levi. We did not know of Levi until yesterday --

"MR. SHERWOOD: Your honor, I'm going to object to this line of discussion. It violates the Miranda right.

"THE COURT: Mr. McLean?

"MR. McLEAN: Your Honor, I don't believe--He mentioned about this Levi and our sources and I'm telling the jury that we tried to locate Mr. Levi.

"THE COURT: I will sustain the objection.

"MR. McLEAN: Thank you, Your Honor . . ."
(Emphasis added.)

Defendant argues the emphasized portions above were also impermissible comments upon his exercise of the right to remain silent, and amount to reversible error.

The questions asked of defendant on cross-examination did not comment upon his failure to give an explanation to law enforcement officials within the context of the right to remain silent. Rather, the questions legitimately explored a subject which defendant himself had placed into dispute during direct examination.

> "If [a defendant in a criminal case] takes the
> stand and testifies in his own defense, his cre-
> dibility may be impeached and his testimony
> assailed like that of any other witness, and the
> breadth of his waiver is determined by the scope
> of relevant cross-examination. '[He] has no
> right to set forth to the jury all the facts
> which tend in his favor without laying himself
> open to a cross-examination upon those facts.'
> . . ." Brown v. United States (1958), 356 U.S.
> 148, 154-155, 78 S.Ct. 622, 626, 2 L.Ed.2d 589,
> 596-597.

Defendant clearly conveyed to the jury, in his direct testimony, his understanding that the check was good, and that he at all times acted in good faith, intending to speak to and resolve the matter with law enforcement officials. After the defendant's direct testimony, the prosecutor's questions were within the scope of relevant cross-examination. Rule 611(b)(1), Mont.R.Evid.

> "[W]hen a witness voluntarily testifies, the
> privilege against self-incrimination is amply
> respected without need of accepting testimony
> freed from the antiseptic test of the adversary
> process. The witness himself, certainly if he
> is a party, determines the area of disclosure
> and therefore of inquiry. Such a witness has
> the choice, after weighing the advantage of the
> privilege against self-incrimination against
> the advantage of putting forward his version of
> the facts and his reliability as a witness, not
> to testify at all. He cannot reasonably claim
> that the Fifth Amendment gives him not only this
> choice but, if he elects to testify, an immunity
> from cross-examination on the matters he has
> himself put in dispute. It would make of the
> Fifth Amendment not only a humane safeguard
> against judicially coerced self-disclosure but a
> positive invitation to mutilate the truth a
> party offers to tell. . . The interests of the
> other party and regard for the function of
> courts of justice to ascertain the truth become
> relevant, and prevail in the balance of con-
> siderations determining the scope and limits of
> the privilege against self-incrimination.
> Petitioner, as a party to the suit, was a volun-

tary witness. She could not take the stand to testify in her own behalf and also claim the right to be free from cross-examination on matters raised by her own testimony on direct examination." Brown, 356 U.S. 155-156, 78 S.Ct. 627, 2 L.Ed.2d 597.

Defendant's reliance upon Doyle v. Ohio (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, is misplaced. The facts there indicate the accused did not testify about their post-arrest acts, intentions or silence. They merely testified to a story which the prosecution had not heard before. The State, on cross-examination, inquired into the fact of and the reasons behind defendants' previous silence, justifying the questions by asserting a need to present to the jury all information relevant to the defendants' credibility. Doyle, 426 U.S. 613-616, 96 S.Ct. 2242-2244, 49 L.Ed.2d 95-97. In this case the defendant testified at length about his actions immediately before as well as after his arrest.

The issue whether interrogation of an accused upon the point of credibility is within the scope of cross-examination is a thorny problem in criminal cases; but there can be no doubt that matters put in dispute by the accused himself by direct testimony are always proper subjects of cross-examination. 3 Weinstein's Evidence, § 611[03].

Defendant's contention about the prosecutor's comments during closing argument remains. We note that the defendant did not object to the State's first reference to its lack of knowledge concerning the man called "Levi." Defendant did object to the second reference; the objection was immediately sustained, and the State did not mention the subject again. The comments were not so extensive, nor did they so stress an inference of guilt based on silence, as to constitute reversible error. Anderson v. Nelson (1968), 390 U.S. 523-524, 88 S.Ct. 1133, 1134, 20 L.Ed.2d 81, 83.

Appellant's Issue Two:

Prior to trial, defendant made several motions in limine.

Motion No. 4 was as follows:

" . . . Defendant . . . respectfully moves the Court as follows:

" . . .

4. To order the prosecution to refrain from asking any questions or soliciting any testimony from any witness regarding statements made by an Ann Doney . . ."

The District Court granted the motion.

Defendant claims the State violated the court's order in limine. He moved for a mistrial at the time. The motion was prompted by the following exchange between the prosecutor and a police officer during the State's case-in-chief:

"Q. I'm handing you State's Exhibit 2 and ask you if you can identify it. A. Yes, sir, I can.

"Q. Would you identify it, please? A. This is the watch that I recovered on that search warrant.

"Q. To whom was this watch listed in the sheriff's department as belonging to? A. Pat Thibodeau.

"Q. Did you have occasion to ask Mrs. Doney how she came into possession of the watch? A. Yes, I did.

"Q. Did she tell you who gave you (sic) the watch? A. Yes.

"MR. SHERWOOD: Objection, Your Honor, this is beyond the scope of the Motions in Limine and it's hearsay.

"THE COURT: Sustained."

The court denied the motion for mistrial stating that the officer's answer was not technically hearsay, but that the objection was sustained because of the inference which might have been left with the jury.

We dispose of this issue by noting that defendant, on cross-examination, testified he gave the ring and the watch to "little kids" "at a house out in Wheeler Village," who "were friends of the people that I lived with." In addition, Anna Doney was called as a rebuttal witness by the State. She

testified to the same points. The issue whether the jury might have gleaned an impermissible inference from the above questions was rendered moot by Anna Doney's testimony that defendant gave the watch and ring to her daughter for the daughter's birthday in June of 1978, and that she was present when defendant gave the items to the daughter. We find Doney's credibility was fully challenged by the defense. The evidence was properly before the jury by other means; any error caused by the police officer's testimony was merely technical, and did not affect any substantial right. Section 46-20-702, MCA; State v. Grady (1975), 166 Mont. 168, 174-175, 531 P.2d 681, 684.

Appellant's Issue Three:

The final issue cites an alleged insufficiency of evidence to support the burglary conviction.

The correct test is whether there is substantial evidence supporting the conviction, viewed in the light most favorable to the State. State v. Brubaker (1981), ____Mont.____, 625 P.2d 78, 81, 38 St.Rep. 432, 436; State v. Azure (1979), ____Mont.____, 591 P.2d 1125, 1131, 36 St.Rep. 514, 520. "Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. State v. Graves (1981), ____ Mont.____, 622 P.2d 203, 208, 38 St.Rep. 9, 14; State v. Merseal (1975), 167 Mont. 412, 416, 538 P.2d 1366, 1368.

Defendant argues the proper test upon review is that articulated in Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573:

> " . . . the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

We find the standard of review applied in Montana since before 1979 does not fall short of the standard mandated in Jackson. Indeed, the Jackson test has previously been applied by this Court. State v. Rodriguez (1981), ____Mont.____, ____P.2d

_____, 38 St.Rep. 578F, 578I.

The State established that defendant had possession of the stolen property. While it is true that such fact alone is insufficient to support the conviction, it is one of the factors which the jury may consider. State v. Pepperling (1974), 166 Mont. 293, 298, 533 P.2d 283, 286; State v. Lane (1973), 161 Mont. 369, 372-373, 506 P.2d 446, 447-448.

A review of the record in a light most favorable to the State indicates that there is substantial evidence upon which a rational jury could have found defendant guilty. The testimony of the clerk in Shaffer's Market and of Anna Doney, and the defendant's possession of the stolen goods; constitute substantial evidence on which to base a verdict.

We affirm the burglary conviction and the eight year sentence. We reverse the misdemeanor forgery conviction, vacate the six months sentence, and dismiss the forgery charge.

                                    _____
                                    Justice

We concur:

_____
Chief Justice

_____

_____
Justices

Mr. Justice Daniel J. Shea dissents and will file a written dissent later.

- 11 -