No. 81-94

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

DARRELL ROSS PLOUFFE,

Defendant and Appellant.

---

Appeal from: District Court of the Fourth Judicial District,
In and for the County of Missoula
Honorable James Wheelis, Judge presiding.

Counsel of Record:

For Appellant:

Hood and Sherwood, Missoula, Montana
Randi Hood argued, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
J. Mark Murphy argued, Assistant Attorney General,
Helena, Montana
Robert L. Deschamps III, County Attorney, Missoula, Montana
Ed McLean argued, Deputy County Attorney, Missoula,
Montana

---

Submitted: March 29, 1982

Decided: June 15, 1982

Filed: JUN 1 5 1982

*Thomas J. Kearney*

Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

Defendant, Darrell R. Plouffe, appeals his deliberate homicide conviction and the denial by the District Court of the Fourth Judicial District, Missoula County, of his motion to suppress statements he made to police.

On June 6, 1980, defendant was arrested for parole violation. On June 9, 1980, defendant was charged with deliberate homicide, as provided in section 45-5-102, MCA. Defendant was arraigned before a Missoula County Justice of the Peace on June 10, 1980, and, on that same day, the parole violation charge was dropped.

On July 14, 1980, an information was filed charging defendant with deliberate homicide. Defendant pleaded not guilty. Defendant's motion to suppress statements given to the police was denied by the District Court on September 8, 1980.

A jury trial was held from September 15 to 19; a guilty verdict was returned on September 19. Defendant made several motions to dismiss: the first at the close of the State's case; the second at the close of his own case; and the third after the guilty verdict was returned. All motions to dismiss were denied by the District Court. Defendant was sentenced to forty years in the Montana State Prison, with twenty years suspended.

In the early afternoon of June 5, 1980, Rena Evans was found dead in her trailer. The cause of death was manual strangulation, occurring sometime between 9:00 p.m. on June 4 and 6:47 a.m. on June 5.

The trailer was described generally as "neat as a pin," with no sign of a struggle having taken place. Evans

was clothed in a red housecoat, zipped to the neck. A wallet was found underneath the couch in the trailer. The wallet contained the identification papers and the driver's license of the defendant, as well as the business card of the defendant's parole officer.

On the evening of June 5, the Missoula County Sheriff contacted the defendant's parole officer. On the grounds that defendant's wallet was found at the scene of a homicide, the parole officer authorized an oral parole violation warrant. A written warrant was executed on the morning of June 6.

On the morning of June 6, defendant was staying at the residence of Brett Tandy, Stacy Lavin and Joe Phelps, who lived at No. 9 South Caravan in a trailer court across from defendant's listed residence at No. 3 South Caravan. While at No. 9 South Caravan, on the morning of June 6, defendant mixed some Drano with milk and drank it. Defendant left behind a note which reads:

> "Brett & Stacy,
>
> "Take care of Toke [defendant's dog]. I'm not going to let my life be caged as I would only have that chose [sic] & I can't talk or I'd end up Ded [sic]. Love ya all. Take care and enjoy life.
>
> "Darrell
>
> "I didn't do it. Three guy out of state."

The last two sentences of the note are written with seemingly less control than the main body of the note.

Brett Tandy found defendant after he drank the Drano and called an ambulance. Defendant was taken to St. Patrick's Hospital that afternoon of June 6, 1980.

Two police officers talked with defendant in the

-3-

hospital emergency room. The tape of this interview indicates that defendant was asked, "Can you tell me what happened and what did you take?" The defendant was unable to respond verbally. On the recording, the defendant can be heard gagging, clearing his throat, and spitting. The officer then asked defendant if he wished to write his answers. Evidently the defendant began to write his answers since a few minutes later the officer said, "So they will kill you, if you say anything." There is more writing and and the officer asks, "Who's they?"

Testimony at the suppression hearing suggests that about this time the emergency room doctor entered and asked that the tape be turned off while he examined defendant.

After the tape recorder was turned back on, the officer informed defendant that he was at St. Patrick's Hospital and it was about 4:00 in the afternoon. At this point, the officer showed the defendant an advice of rights form and explained it to him. Upon asking defendant if he understood the form, the officer said, ". . . you're nodding yes, that you do understand those [the rights]." The defendant then signed the waiver of rights and proceeded to write his responses to police questions.

Including the interview at the emergency room, defendant was interviewed by authorities five times. He was interrogated by police in the evening of June 6, and again on June 7. Defendant's parole officer interviewed him on June 9. On June 26, defendant was again interrogated by police, but defendant had his attorneys present. Guards were assigned to watch defendant on the evening of June 6. Visitors and telephone calls were restricted.

-4-

The State, throughout its case, has emphasized the discrepancies in the statements given by defendant. Defendant's final narration of what happened on the night of June 4-5 is summarized as follows:

> Defendant was out drinking with friends until the bars closed. In the early morning hours of June 5, he stopped at Evans' trailer. Defendant and Evans engaged in sexual intercourse. Soon thereafter, two men entered the residence. One man was wearing a burgundy long-sleeve down jacket and blue jeans; the only clothing defendant could remember about the second man was that he was also wearing blue jeans.

> The man in the goose down jacket walked over to Evans; talked with her, and slapped her. At this time, the second man pulled defendant to the floor and kicked him. Defendant was told not to say anything or he and his girlfriend, Janice, would get hurt.

> Defendant then left Evans' trailer, went back to his trailer and drank some schnapps'. About a half hour later, he returned to Evans' trailer and found her lying face down on the floor. He turned her over, noticed that her face was dark, and thought he heard her gasping for breath. Thinking that she would be all right, defendant left the trailer.

> He noticed that his wallet was missing and went with a friend to look for it in a bar parking lot, but they didn't find it.

The above statement differs from defendant's first three statements in that defendant first told police that two men, with possibly a third he heard in a back room, were already at Evans' house when he arrived. No mention was made of his having sexual intercourse with the victim. Instead of jeans, the defendant first told police the men were wearing jumpsuits. In the last two statements, defendant said that Evans was alone when he arrived, that they had sexual intercourse, and then the two men arrived.

Testimony indicated that after defendant left Evans'

trailer the second time, he went to No. 9 South Caravan, where he had been staying. He slept for a while and in the evening of June 5 went to a movie. Also, on that evening, he was told by one of his roommates that Rena Evans had been found strangled. The next morning defendant was found after he drank the Drano.

The defendant has raised two basic issues:

1. Whether the District Court erred in denying his motion to suppress the statements he made to the police or his parole officer prior to June 10, 1980; and

2. Whether the District Court erred in denying defendant's motion to dismiss.

Four subsidiary issues were raised by defendant to support his argument that his motion to suppress was improperly denied:

A. Whether the State proved a knowing and intelligent waiver of the right to counsel and right against self-incrimination by the defendant prior to interrogations conducted on June 6, 1980;

B. Whether subsequent statements made by defendant should have been suppressed under the "cat out of the bag" theory;

C. Whether the statements taken from defendant prior to June 10 are products of an arrest lacking probable cause; and

D. Whether defendant's statements should have been suppressed because of the State's unnecessary delay in taking the defendant before a judge.

## I. Motion to Suppress

The defendant first contends that the statements he made to police in the hospital emergency room on June 6, 1980, should have been suppressed because the State failed to show that defendant made a knowing waiver of his right to counsel and right against self-incrimination. Defendant claims that while there is a showing that he was read his rights, there is no showing that he understood them.

The Supreme Court of the United States has recently set down a two-pronged test to determine whether a defendant has made a valid waiver of his rights. In Edwards v. Arizona (1981), ___ U.S. ___, 101 S.Ct. 1880, 68 L.Ed.2d 378, the Court said:

> ". . . It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but constitute a knowing and intelligent relinquishment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' Johnson v. Zerbst (1938), 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461. [Other citations omitted.]" 101 S.Ct. at 1883-1884, 68 L.Ed.2d at 385.

This Court has recently outlined further relevant factors which must be considered in determining whether there has been a valid waiver:

> ". . . Other appropriate considerations include the age, education, and intelligence of the accused, and his capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights . . . [Citations omitted.] In addition, a valid waiver must include not merely a comprehension of the benefits being abandoned, but also an actual relinquishment of those benefits, as evidenced by the actions or statements of the accused. [Citations omitted.]" State v. Blakney (1982), ___ Mont. ___, 641 P.2d 1045, 1049, 39 St.Rep. 436, 440.

The District Court found that defendant made a knowing waiver of his rights, drawing from the record and the testimony as to his appearance. We will not disturb this finding of the District Court if there is substantial credible evidence to support it. State v. Davison (1980), ___ Mont. ___, 614 P.2d 489, 493, 37 St.Rep. 1135, 1139; State v. Grimestad (1979), ___ Mont. ___, 598 P.2d 198, 36 St.Rep. 1245.

Here, the defendant signed a waiver of rights form. The tape of the first interview suggests that defendant was able to understand and respond to police questioning. The officer who questioned defendant testified that defendant seemed cognizant of his actions. The doctor who saw defendant after he left the emergency room testified that defendant was coherent and able to give a cognizant statement to police. As the State has pointed out, the defendant is not a person inexperienced with police procedures; he was previously convicted of a felony and on parole at the time of the offense.

The above evidence was sufficient for the District Court to conclude that defendant made a knowing and intelligent waiver of his rights at the first interview in the emergency room.

Since we affirm the District Court's finding that defendant made a knowing and intelligent waiver, defendant's "cat out of the bag" argument need not be addressed.

Defendant next contends that his statements made to the police on June 6, June 7, and June 9 should be suppressed because they are the result of an arrest lacking probable cause.

-8-

The District Court found that the parole violation warrant was properly issued and the arrest properly made because defendant's wallet was found at the scene of a criminal homicide. Even if the warrant was not properly issued, the District Court concluded that no violation of defendant's rights would have resulted. We agree.

The test is whether there was probable cause or reasonable grounds to believe that the defendant had committed acts that constituted a violation of parole conditions. Morrissey v. Brewer (1972), 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484. In Petition of Wing (1969), 154 Mont. 501, 464 P.2d 302, we upheld the arrest of a parolee for giving a fictitious name and "frequenting taverns."

Under condition of parole, Rule 1, the parolee is under a general duty to obey and respect the law and be a good citizen. The fact that the parolee's wallet was found at the scene of a criminal homicide gave the police reasonable grounds to believe that there was a breach of condition of parole or a violation of a law.

The defendant next contends that the delay between his arrest on Friday, June 6, for parole violation and his arraignment on June 10 for deliberate homicide constituted an "unnecessary delay" in bringing him before a judge and, therefore, his statements to the police during that time should be suppressed.

As we noted recently in State v. Rodriguez (1981), ___ Mont. ___, 628 P.2d 280, 38 St.Rep. 578F, we will not hesitate to fashion an appropriate remedy, "[i]f the defendant can show prejudice or a deliberate attempt by the prosecution to circumvent a speedy arraignment." 628 P.2d

at 284. The burden is first on the defendant to show that the delay was unnecessary. State v. Benbo (1977), 174 Mont. 252, 570 P.2d 894, 900.

Here, the defendant only showed that a justice of the peace was available from June 6 to June 9. Defendant's presence in the hospital during this time suggests that the delay in bringing him before a magistrate was neither unreasonable nor prejudicial.

More importantly, when statements to police are in issue, the requirement of a prompt initial appearance is viewed in the context of the voluntariness of the statement. See, State v. Nelson (1961), 139 Mont. 180, 362 P.2d 224; State v. White (1965), 146 Mont. 226, 405 P.2d 761; and Benbo, supra. Here, there is nothing to suggest that the delay influenced the voluntariness of defendant's statements to police while he was at the hospital.

The statements given to the police by the defendant were therefore properly admitted into evidence, and the motion to suppress the statements was properly denied by the District Court.

II. Motion to Dismiss

In denying defendant's motion to dismiss, the District Court stated:

> ". . . Montana has not adopted the standard argued by the Defendant. The State, in their brief, mistakenly says that Montana has adopted the new standard of sufficiency of the evidence set forth in Jackson v. Virginia in State v. Armstrong, 37 St.Rep. 1563 (1980). In that case the Court says, 'The test for the sufficiency of the evidence in a criminal case is whether there is relevant evidence which persons of reasonable minds might accept as adequate to support a conclusion.' 37 St.Rep. at 1567. This is simply a

restatement of the 'no evidence' rule: if there is relevant evidence in the record, the Court will not disturb the verdict. The Court will not make an independent analysis of whether the State carried its burden of proving its case beyond a reasonable doubt."

Defendant contends that the District Court erred by the above analysis and that, at least since State v. Rodriguez, supra, this Court has adopted the standard set down in Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

In Jackson the United States Supreme Court stated that in determining whether the evidence is sufficient to support a criminal conviction, ". . . the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319.

In State v. Rodriguez, supra, this Court cited Jackson, stating, "[t]he evidence is sufficient to permit any rational trier of fact to find that defendant inflicted the deadly blow or blows." 628 P.2d at 283.

The District Court incorrectly stated that this Court applies a "no evidence" rule on review of sufficiency of the evidence in criminal convictions. This Court has consistently applied in recent years the test of whether there is substantial evidence to support the conviction, viewed in a light most favorable to the State. See, e.g., State v. Kirkaldie (1978), 179 Mont. 283, 587 P.2d 1298; State v. Campbell (1980), ___ Mont. ___, 615 P.2d 190, 37 St.Rep. 1337; and State v. Wilson (1981), ___ Mont. ___, 631 P.2d 1273, 38 St.Rep. 1040. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate

-11-

to support a conclusion." See, _Wilson_, 631 P.2d at 1278, and cases cited therein.

Moreover, in _Wilson_, this Court concluded that the "substantial evidence" standard does not fall short of the _Jackson_ standard, and we noted that the _Jackson_ standard was applied in _Rodriguez_.

The question here then is simply whether there is substantial evidence to support the defendant's conviction.

The evidence against the defendant, in summary, is that he was with Rena Evans between approximately 2:30 a.m. and 4:30 a.m. on June 5, 1980. Defendant had sexual intercourse with Evans. Defendant's wallet was found under Evans' couch. The Evans' home showed no signs of a struggle. Defendant attempted suicide by drinking Drano on June 6, 1980. Defendant gave five statements to police containing several inconsistencies. In his statements, defendant implausibly claimed he heard Evans gasping for breath when he returned to her trailer. He did not seek medical attention for her. Moreover, when defendant discovered his wallet was missing, he did not return to Evans' trailer but rather went to the parking lot of a bar. We believe these facts constitute substantial evidence and are therefore sufficient to support the conviction.

Defendant claims that the above facts show only that he had the opportunity to commit the act and nothing else.

There is little question that this is a close case. The evidence against the defendant is highly circumstantial. Nevertheless, as we noted in State v. Armstrong (1980), _____ Mont. _____, 616 P.2d 341, 37 St.Rep. 1563, circumstantial evidence is not always inferior quality. "The determination

-12-

as to the sufficiency of circumstantial evidence to make a case for the jury and to sustain a conviction is one to be made upon all the facts and circumstances which are to considered collectively." 616 P.2d at 346.

Based on the above facts, any rational trier of fact could find the defendant guilty beyond a reasonable doubt. As in our prior cases, we are reluctant to take this fact-finding duty away from the jury.

The District Court's judgment is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

Honorable Robert M. Holter,
sitting in place of Mr.
Justice John C. Sheehy