MR. JUSTICE MORRISON
delivered the opinion of the Court.
Defendant William Allen Norgaard appeals from a verdict and judgment convicting him of three counts of deliberate homicide. Three issues are presented on appeal:
(1) Whether the District Court erred in refusing to suppress statements made by defendant to a criminal investigator during an interview conducted without counsel and after filing of an information?
(2) Whether the District Court erred in excluding as hearsay a statement victim Stanley Nees made to witness Howard Kelsey regarding the threat against Nees’ life?
(3) Whether the District Court erred in refusing defendant’s proposed instructions regarding mitigated deliberate homicide?
On February 25,1981, Stanley Nees, Leota Hoye and Mildred Geer were shot to death in Poplar, Montana. William Norgaard was arrested and charged with three counts of deliberate homicide on March 4, 1981, after a lab report confirmed that shells found at the scene of the crime and shells found in the Norgaard home were fired from the same rifle. Norgaard was arraigned by the District Court judge in the Trinity Hospital in Wolf Point, Montana, where Norgaard was being treated for colitis and observed for suicidal tendencies.
On March 7,1981, Norgaard was taken to Missoula, Montana, where he was admitted to St. Patrick’s Hospital for medical and psychiatric evaluation. Dr. Will Stratford assisted with defendant’s admission and treatment.
On March 11,1981, Dr. Stratford inquired of Special Prosecutor Marc Racicot as to whether a psychiatric evaluation was to be ordered for Norgaard and whether defense coun *168 sel had been appointed on Norgaard’s behalf. Stratford was concerned about appointment of counsel because Norgaard was becoming more talkative to hospital personnel. Racicot informed Dr. Stratford that on the previous day the District Court had appointed Francis McCarvel defense counsel and that McCarvel had immediately requested a court-ordered psychiatric evaluation of Norgaard. The District Court ordered the evaluation on March 11, but Stratford had not yet received a copy of the order.
Following Stratford’s call, Racicot telephoned State Criminal Investigation Bureau agent Gary Carrell. Agent Carrell was assisting Roosevelt County law enforcement authorities in the investigation of the triple homicide and had previously interviewed Norgaard on March 3-4, 1981, in Wolf Point, regarding any information Norgaard might have concerning the crimes.
Agent Carrell then met with Racicot in Racicot’s Helena office. Racicot informed Agent Carrell that Dr. Stratford thought Norgaard was becoming more vocal. Racicot and Agent Carrell discussed whether Carrell should go to Missoula and interview defendant without presence of or notice to defense counsel. Racicot told Agent Carrell that the Roosevelt County Attorney’s policy was not to interview defendants without first contacting defense counsel, that some states do not allow such interviews, and that Montana had not decided the question of the propriety of interrogations in absence of counsel. Agent Carrell was left to decide whether or not he should interview Norgaard.
Agent Carrell chose to interview Norgaard without informing defense counsel of his decision. Carrell arrived in Missoula around 8:00 p.m., March 11, 1981. Carrell called Dr. Stratford and inquired if defendant’s physical and mental health could withstand questioning. Dr. Stratford responded that Norgaard’s condition would not be impaired by such an interview.
Carrell went to the hospital that night and attempted to interview defendant. Carrell advised defendant of his Mi *169 randa rights and told Norgaard that McCarvel had been appointed as his defense counsel. Carrell specifically told Norgaard that he had a right to have his attorney present during any interview or to consult with his attorney prior to an interview. When asked whether he understood what Carrell had said, Norgaard nodded. Norgaard then responded to questions asked by Agent Carrell. During this interview, Carrell elicited from Norgaard that he remembered picking up the shell casings in Leota Hoyes’ apartment and that he was upset with Stanley Nees because defendant’s father was having financial problems. Nees was a local banker. As Carrell left Norgaard’s hospital room that evening, he explained he would return the next morning to continue their discussion of the slayings.
Norgaard was more responsive the following morning. After Carrell had again advised him of his rights and explained that McCarvel had been appointed to represent defendant, defendant stated he understood and proceeded to answer Carrell’s questions. During this interview, Norgaard supplied Carrell with information which led to the discovery of the murder weapon.
On August 17, 1981, a pretrial suppression hearing was held regarding the admissions made by Norgaard during the March 11 and 12 interviews. Dr. Stratford testified that defendant was mentally capable of waiving his rights and that he could make voluntary and intelligent choices while in St. Patrick’s Hospital. Agent Carrell testified as to the circumstances and content of the interviews. The only record of the interviews was Carrell’s handwritten notes. The defendant did not testify.
The District Court denied defendant’s motion to suppress, finding that the State had sustained its burden of proving that defendant made an effective waiver of his rights, albeit without consultation from defense counsel.
At trial Agent Carrell testified about the March 11 and 12 interviews. Howard Kelsey, appearing for defendant, testified that he observed victim Nees and two men (not defen *170 dant) in an argument some twelve days before the murders and that Nees was in an excited state after the argument. The trial court would not allow Kelsey to testify that approximately one hour after the argument occurred Nees told Kelsey that the two men had threatened his life. Dr. Stratford did not testify at trial.
The jury found Norgaard guilty of three counts of deliberate homicide. No instructions were given the jury regarding the offense of mitigated deliberate homicide. The Fifteenth Judicial District Court subsequently sentenced Norgaard to three hundred years in the Montana State Prison.
I.
Defendant contends that Agent Carrell impermissibly interfered with his Sixth Amendment right to counsel when he questioned defendant without first notifying defense counsel. Defendant asserts that an effective waiver of the right to counsel cannot be secured unless defense counsel is present when the waiver is given. This argument is based upon the New York Court of Appeals’ decision in People v. Hobson (1976), 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894.
Alternatively, defendant contends that Agent Carrell violated his Sixth Amendment right to counsel when Carrell proceeded to interview defendant in disregard of the Roosevelt County Attorney’s policy not to interview defendants without consulting defense counsel. Defendant believes that under either a factually-limited or an expansive interpretation of Brewer v. Williams (1977), 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424, reh. den., 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 240, the statements obtained by Carrell should have been suppressed because they were derived outside counsel’s presence.
In Hobson, supra, defendant was represented by counsel who had been present during a line-up at which defendant was identified. Counsel left after the identification was made. Knowing that defendant was represented by counsel, and without notice to counsel, Detective Dolan proceeded *171 to interview defendant. An oral waiver of the right to counsel was secured by Dolan, whereafter defendant confessed to the robbery under investigation. Defendant’s statements were used against him at trial.
The New York Court of Appeals reversed defendant’s conviction on the basis that defendant’s statements were obtained in violation of New York’s constitutional and statutory guarantees of the privilege against self-incrimination, the right to assistance of counsel, and due process of law. The New York Court of Appeals held that, “[o]nce a lawyer has entered a criminal proceeding representing a defendant in connection with criminal charges under investigation, the defendant in custody may not waive his right to counsel in the absence of the lawyer.” People v. Hobson, 39 N.Y.2d at 483, 384 N.Y.S.2d at 421, 348 N.E.2d at 896. The court explained that the presence of counsel provides a more effective safeguard against involuntary waiver of right to counsel than a mere written or oral warning and that any attempt, by prosecution or law enforcement alike, to secure a waiver of the right of counsel in a criminal proceeding in absence of defense counsel would constitute a breach of professional ethics.
Brewer v. Williams, supra, involved a defendant who turned himself into law enforcement authorities on the advice of his attorney McKnight in Des Moines, Iowa. Defendant was booked in Davenport, Iowa, on an abduction charge that was specified in an outstanding arrest warrant. Defendant was to be transported from Davenport to Des Moines in a police car. Before defendant started his journey, he consulted with an attorney named Kelly in Davenport and telephoned McKnight in Des Moines. Both attorneys advised him not to make any statements until after he personally conferred with McKnight in Des Moines. McKnight and Detective Learning, a veteran of the Davenport police department, agreed that Williams would not be questioned during his trip to Des Moines. Kelly firmly admonished Detective Learning to honor his agreement with Me- *172 Knight. Without counsel Williams set off for Des Moines with Detective Learning and another police officer. Detective Learning did not formally interrogate Williams; instead he used what has been referred to as the “Christian burial speech” to induce Williams into disclosing the whereabouts of the young victim’s body.
Invoking the rule of Massiah v. United States (1964), 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (violation of Sixth Amendment found where federal agents deliberately elicited incriminating evidence from defendant after he had been indicted and in absence of his counsel), the United States Supreme Court held that Detective Learning violated Williams’ Sixth Amendment right to counsel. In doing so, the Court acknowledged that even though Williams previously had been informed of and appeared to understand his right to counsel, Detective Learning neither advised Williams that he had a right to presence of an attorney or made an effort to ascertain whether Williams wished to relinquish that right when he deliberately elicited from defendant incriminating evidence in absence of his counsel. Referring to the Johnson v. Zerbst standard of “an intentional relinquishment or abandonment of a known right or privilege” [(1938), 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466], the Brewer court did not hold that Williams could not, without notice to counsel, waive his rights under the Sixth and Fourteenth Amendments; instead, it specifically stated that the State of Iowa failed to sustain its heavy burden in proving that Williams had intentionally relinquished his right to counsel.
This Court hereby holds that a defendant, charged under information or indictment and represented by counsel, may waive his right to counsel, without notice to or presence of counsel, during an interview initiated by law enforcement officers investigating the charged crime, so long as defendant’s waiver is voluntary, knowing and intelligent as shown by the particular facts and circumstances surrounding that case.
*173 We expressly reject the rule of People v. Hobson, supra. In adopting a per se rule the New York court has gone beyond the contours of Johnson v. Zerbst and its progeny in holding that despite “the particular facts and circumstances of [a] case, including the background, experience and conduct of the accused,” Edwards v. Arizona (1981), 451 U.S. 477, 482, 101 S.Ct. 1880, 1883-1884, 68 L.Ed.2d 378, 385, citing Zerbst, supra, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed.2d 1461, 1466, a defendant cannot effect a valid waiver of the right to counsel, without counsel’s presence or consent. While we do not dispute the assertion that the presence of counsel provides a more effective safeguard against involuntary waiver than a written or oral Massiahtype warning, we emphatically disagree with the New York court’s implicit assumption that written and oral warnings in absence of counsel cannot ensure that a defendant’s right to counsel will be protected from unintentional relinquishment. The vast majority of jurisdictions have upheld counselless waivers which were obtained after written or oral warnings have been given. State v. McLucas (1977), 172 Conn. 542, 375 A.2d 1014, cert. denied, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126; Pierce v. State (1975), 235 Ga. 237, 219 S.E.2d 158; State v. Ruth (1981), 102 Idaho 638, 637 P.2d 415; People v. Aldridge (1979), 68 Ill.App.3d 181, 24 Ill.Dec. 484, 385 N.E.2d 396; State v. Costa (1980), 228 Kan. 308, 613 P.2d 1359; Watson v. State (1977), 35 Md.App. 381, 370 A.2d 1149, aff’d, 282 Md. 73, 382 A.2d 574, cert. denied, (1978) 437 U.S. 908, 98 S.Ct. 3100, 57 L.Ed.2d 1140; State v. Williams (Mo.App.1978), 566 S.W.2d 841; People v. Green (1979), 405 Mich. 273, 274 N.W.2d 448; Giddings v. State (Minn. 1980), 290 N.W.2d 595; State v. Jackson (1980), 205 Neb. 806, 290 N.W.2d 458; State v. Romero (1982), 56 N.C.App. 48, 286 S.E.2d 903; Matter of Sanders (1982), 56 Or.App. 724, 643 P.2d 384; Commonwealth v. Lowery (1980), 276 Pa.S. 569, 419 A.2d 604; McPherson v. State (Tenn.Cr.App.1977), 562 S.W.2d 210; Lamb v. Commonwealth (1976), 217 Va. 307, *174 227 S.E.2d 737; State v. Clawson (W.Va.1980), 270 S.E.2d 659; Jordan v. State (1980), 93 Wis.2d 449, 287 N.W.2d 509.
In rejecting People v. Hobson, supra, we also note the language in another Sixth Amendment case, United States v. Henry (1980), 447 U.S. 264, 275, fn. 14, 100 S.Ct. 2183, 2189, fn.14, 65 L.Ed.2d 115, wherein Mr. Chief Justice Burger stated that bar association disciplinary rules have no constitutional bearing. See also, Massiah v. United States, supra, 377 U.S. 201, 210, 84 S.Ct. 1199, 1205, 12 L.Ed.2d 246 (Mr. Justice White dissenting); United States v. Thomas (10th Cir.1973), 474 F.2d 110, 112, cert. denied, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160; State v. Richmond (1976), 114 Ariz. 186, 560 P.2d 41, 46, cert. denied, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101; State v. Ruth, supra, 102 Idaho 638, 637 P.2d 415, 417; State v. Nicholson (1969), 77 Wash.2d 415, 463 P.2d 633. We agree. “The admissibility of evidence in a court of law. . .is normally determined by reference to relevant constitutional and statutory provisions, applicable court rules and pertinent common-law doctrines. Codes of professional conduct play no part in such decisions.” People v. Green, supra, 274 N.W.2d at 454.
Careful review of the line of cases following Massiah reveals that the United States Supreme Court has not interpreted the Sixth and Fourteenth Amendments to require counsel’s notice or agreement before an effective waiver can be found. What Massiah, Brewer, and Henry stand for is the proposition that federal and state agents cannot deliberately elicit incriminating evidence from an indicted defendant in defense counsel’s absence, unless an intentional relinquishment of the right to counsel has been secured from defendant. In none of these cases was defendant given an express opportunity, as was defendant here, to effectively assert or waive his right to counsel. Unlike Norgaard who voluntarily and knowingly participated in a formal interview conducted by an identified criminal investigator, Mas *175 siah, Brewer and Henry were the objects of surreptitious, subtle investigative techniques deliberately designed to secure incriminating evidence, from unwitting defendants.
Defendant mistakenly equates the express agreement between police and defense counsel in Brewer v. Williams, supra, with the Roosevelt County Attorney’s policy not to interview defendants without notifying defense counsel. The significance of the agreement in Brewer was not its breach but the fact that the breach resulted in an impermissible interference with defendant’s right to counsel. Agent Carrell’s decision may have eroded trust between the Roosevelt County Attorney and defense counsel but it did not produce an unintentional abandonment of a constitutional right. What is constitutionally guaranteed here is defendant’s right to assistance of counsel, not defense counsel’s right to assist defendant.
In an attempt to underscore his Sixth Amendment Brewer-Hobson contentions, defendant’s brief draws much attention to the facts and circumstances surrounding defendant’s waiver; however, defendant does not directly challenge the District Court’s conclusion that defendant executed a voluntary, knowing and intelligent waiver of his right to counsel.
We nevertheless have reviewed the record and the District Court’s order and memorandum opinion. It is evident that the District Court applied the appropriate test to determine whether defendant made a valid waiver of his rights and concluded that a knowing waiver was given. Finding no legal error and substantial credible evidence to support the District Court’s findings, the District Court’s conclusion that a valid waiver was effected will not be disturbed. State v. Plouffe (1982), 197 Mont. 379, 646 P.2d 533, 39 St.Rep. 1064.
II.
Defendant contends that the District Court erred when it refused to permit Howard Kelsey to testify to the fact that shortly before the crime occurred, two men, other than de *176 fendant, threatened Stanley Nees’ life. Defendant would have the declarations made by Nees admitted under one of three exceptions to the hearsay rule: (i) the excited utterance exception under Mont.R.Evid., Rule 803(2), (ii) the statement against interest exception under Mont.R.Evid., Rule 804(b)(3); or (iii) the catch-all “other exceptions” category of Mont.R.Evid., Rule 804(b)(5).
As a general rule, the question of admissibility under a hearsay exception is left to the sound legal discretion of the trial court; only a case of manifest abuse of discretion will warrant reversal on appeal. State v. Caryl (1975), 168 Mont. 414, 543 P.2d 389.
We find no abuse of discretion here. One hour had passed between when Nees had an argument with two men and he recounted the contents of that argument to Kelsey. Given the time lapse and the fact that the event precipitating excitement was a verbal argument rather than an assault with a weapon, under State v. Swazio (1977), 173 Mont. 440, 568 P.2d 124, it was reasonable for the District Court to conclude that the “excited utterance exception” should not apply.
Regarding defendant’s “statement against interest” assertion, we find it to be too tenuous to warrant serious consideration, thus, we cannot here fault the District Court for not accepting it.
Defendant’s third evidentiary argument deserves comment. Defendant argues that the statement made by Nees to Kelsey has comparable circumstantial guarantees of trustworthiness as the other specified exceptions to the hearsay rule.
The only opportunity this Court has had to discuss the “comparable trustworthiness” exception was in a dissenting opinion to Jacques v. Montana National Guard (1982), 199 Mont. 493, 649 P.2d 1319, 39 St. Rep. 1565 (Mr. Justice Harrison dissenting). There, Justice Harrison, referring to the commission comments, recognized and liberally applied the guidelines set forth in the federal counterpart to this *177 section. Those criteria: (1) the statement is offered as evidence of a material fact; (2) it is more probative on the point for which it was offered than any other evidence; and (3) the general purposes of the rules and the interests of justice will be served by its admission. Rule 804(b)(5), Fed.R.Evid.
Unlike Jacques, where the excluded testimony was arguably the lynch pin of plaintiff’s case, the testimony here is but tangentially related to the critical question of who killed Stanley Nees, Leota Hoye and Mildred Geer. Against an evidentiary backdrop that included all but a confession by defendant that he committed the homicides, it cannot be seriously contended that interests of justice were frustrated by the exclusion of such testimony.
III.
Defendant’s final contention is that he was entitled to an instruction on the lesser included offense of mitigated deliberate homicide. In support of his argument, he refers to defendant’s thirteen-year history of suffering from a mental illness and his expressed concern about the financial problems his father was experiencing.
Defendant correctly relies on State v. Gopher (1981), Mont., 633 P.2d 1195, 1196, 38 St.Rep. 1521, 1523, for the rule that “if any evidence exists in the record which would permit the jury to rationally find [defendant] guilty of a lesser offense and acquit him of a greater,” a defendant is entitled to instructions on lesser included offenses. However, the difficulty with defendant’s final contention is not its legal bearing, but its lack of evidentiary support.
In its initial brief, defendant as much as concedes that, standing alone, defendant’s concern for his father’s financial well-being would not suffice to support an instruction on mitigated deliberate homicide. We agree. No evidence was presented at trial regarding the nature or extent of defendant’s mental condition. Dr. Stratford testified at a pretrial suppression hearing. The only other evidence of defendant’s mental history was presented to the court for its *178 sentencing considerations. Without that context or other evidentiary support, it cannot be said that there was any evidence to support a theory that defendant acted under the influence of extreme mental or emotional stress for which there is a reasonable explanation or excuse.
Affirmed.