No. 80-240

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

---

STATE OF MONTANA,

Plaintiff and Appellant,

vs.

GUY JOHN ALLIES,

Defendant and Respondent.

---

Appeal from:   District Court of the Thirteenth Judicial District,
               In and for the County of Yellowstone.
               Honorable Charles Luedke, Judge presiding.

Counsel of Record:

For Appellant:

Hon. Mike Greely, Attorney General, Helena, Montana
Harold F. Hanser, County Attorney, Billings, Montana
Klaus P. Richter argued, Deputy County Attorney,
 Billings, Montana

For Respondent:

Richter and Lerner, Billings, Montana
Alan J. Lerner argued, Billings, Montana

---

Submitted: November 14, 1980

Decided: DEC 31 1980

Filed: DEC 31 1980

Thomas J. Kearney
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant Guy John Allies was convicted of four counts of mitigated deliberate homicide following a jury trial in Yellowstone County District Court. He was sentenced to serve consecutive terms of 40 years imprisonment on each count in the Montana State Prison, without possibility of parole. On December 31, 1979, this Court reversed the defendant's conviction and remanded the case for a new trial.

On remand the State charged the defendant with four counts of mitigated deliberate homicide, and the defendant promptly moved to suppress certain items of evidence. On April 21, 1980, a hearing was held on the motions to suppress an alleged statement made by the defendant to Cathy Terry and physical evidence consisting of .22 caliber cartridges which were seized pursuant to an alleged consensual search of the defendant's van.

On June 11, 1980, defendant's motions to suppress the two items were granted. The State now appeals from the order suppressing the statements and cartridges.

The facts relevant to this appeal follow. A more detailed statement of the facts of this case may be found in State v. Allies (1979), ____Mont.____, 606 P.2d 1043, 36 St.Rep. 2352.

The crimes underlying the case took place in Billings, Montana, on November 11, 1976. The Billings Police Department, in investigating the crimes, had identified Guy John Allies as a person who had dealt in drugs with the homicide victims. In connection with the investigation, the defendant voluntarily came to the police station for questioning on November 22 and November 23, 1976. During the November 23 interview, officers Hirischi and Bell noted that Allies had trouble answering questions, could not keep names or dates straight and was possibly on drugs.

On November 30, 1976, Allies voluntarily took a polygraph exam. The test took approximately three hours. By the end of the three hour period, defendant was described as "talking to the

- 2 -

walls" and "completely out of it."

On the morning of December 9, 1976, police officers again asked Allies to come to the police station. Defendant voluntarily presented himself at the station around 11:00 a.m. and was taken to a 12' x 12' room on the fourth floor. Here he was isolated and questioned for approximately four hours by officers Bell and Trimarco. He had not had anything to eat but was under the influence of a large quantity of drugs—namely, methamphetamine, triavil and morphine. Before the session began, Bell read defendant his Miranda rights off a card, and defendant signed a waiver printed on the back of the card.

The officers attempted to employ a "Mutt and Jeff", or a "mean cop—nice cop" method of interrogation during the first part of the session. One of the officers testified that he got a "little emotional" during the interview. Allies described the officers as generally rough, harsh and obnoxious. Both officers eventually told defendant that if he needed psychiatric help, it was available. He was also told something was wrong with the November 30 polygraph test and that the officers knew he was the murderer. He was accused of the crimes on several occasions, and the questioning concentrated on how he could live with himself after committing such brutal acts. In employing this "guilt assumption" method of interrogation, both officers freely concede they lied to defendant about what they knew of his connection to the homicides. They told him he had been positively identified and placed at the scene of the crime.

At first defendant's story was consistent with what he had earlier told Detective Hirischi. He said he was working on his van at a rented garage when the homicides occurred and had returned home about 1:00 or 2:00 p.m. on November 11. After about twenty minutes, Trimarco advised defendant that they did not believe his story, that he was a suspect in the homicides, that they knew he was the killer, and that he had positively been

placed at the scene of the crime.

Defendant then changed his story. He stated that he had "blacked out" as he was changing oil and "came to" at a grocery store near the victims' house. He said he could not remember where he was at the time the crimes were committed. During the questioning, defendant was shown a picture of one of the victims as she was found on November 11. Defendant became upset and very depressed at the idea he could have committed such an act. He began to sob and threatened to commit suicide. He told the officers of his heavy drug use; that he believed the "Space Brothers" had landed in Wyoming and were exerting an evil influence over him; that he believed in witchcraft; and, that his ex-wife was a witch who had placed an evil curse on him.

Defendant says he was suffering from drug withdrawal and at about 3:00 p.m. asked for food to relieve his discomfort. The officers do not recall such a request. Allies said he thought he needed psychiatric help, and the officers expressed the opinion that his problem was medical or mental rather than criminal. Hospitalization at Warm Springs was mentioned.

During the interrogation, the officers told defendant they were not "too concerned with drugs" rather, they were seeking information or evidence pertinent to the homicides. They said they would like to search his house and van for homicide evidence, and defendant executed the following consent to search:

> "I, Guy John Allies,
> GIVE Det. Bell and Trimarco WHO HAVE IDENTIFIED
> THEMSELVES AS POLICE OFFICERS FOR THE CITY OF
> BILLINGS, YELLOWSTONE COUNTY, DO HEREBY CONSENT
> TO HAVE THEM SEARCH MY HOME OR PROPERTY LOCATED
> AT 628 No. 14 1965 GMC Van Blue AND I HAVE ALSO BEEN
> ADVISED THAT I DO NOT HAVE TO GIVE THESE
> OFFICERS PERMISSION TO SEARCH MY HOME AND
>
> PROPERTY. I AM GIVING THIS CONSENT WITHOUT ANY
> THREATS OR PRESSURES OF ANY TYPE USED AGAINST
> ME.
>
> SIGNED:  S/Guy John Allies
>
> "WITNESS:  S/G. Bell  ADDRESS  Billings Police
> Dept.

"WITNESS:  S/John Trimarco  ADDRESS  B.P.D."

Bell and Trimarco left defendant's presence about 3:45 p.m. and were engaged in searching the house and van from about 4:00 to 7:30 p.m.  Meanwhile, defendant was left in the fourth floor room.  Because of his suicide threats, he was "watched" by Officers Ward and Millard.  Allies testified that during this time he asked Ward when he would be allowed to see an attorney and that he was told to wait until Bell and Trimarco returned. Ward denied that this occurred.

During the afternoon, both Lt. Hensley and Harold Hanser, the Yellowstone County attorney, had been posted on the progress of the interrogation.  At approximately 4:15 p.m., Hanser contacted Dr. Bryce Hughett, a psychiatrist employed by the State.  Hanser informed him there was a suspect in the homicides who could not remember where he had been when the crimes were committed.  He also said the suspect had indicated a desire to see a psychiatrist and asked Hughett to come down.

On arriving at the station, Hughett was further briefed on the situation by Hanser and Lt. Hensley.  Hughett, who felt he was acting as a fact finder or assistant to the investigator and as a doctor, talked with defendant from approximately 5:00 to 6:00 p.m.  Hughett stated that Allies was "calm--spoke quietly and willingly."  The major topics of discussion were defendant's past, particularly his drug abuse problem, and the homicides. During the interview, Hughett suggested that sodium amytal, a hypnotic drug, might allow Allies to remember where he had been during his November 11 blackout.

After the interview by Dr. Hughett, Bell and Trimarco returned from searching defendant's house and van.  They had found drugs at his house and a number of .22 caliber cartridges in the van.  Allies was arrested for possession of dangerous drugs and placed in jail.  At the defendant's preliminary hearing in justice court on December 10, 1976, he asked to see an attor-

- 5 -

ney and was told that an attorney could be appointed only in District Court and that one would be appointed upon his appearance in that court.

After an interview with Harold Hanser, the defendant agreed to a sodium amytal injection. The next day Allies was transported to the psychiatric ward at Deaconess Hospital. That evening, after hearing strange noises from defendant's room, a guard entered and found defendant crouched on the bed, sobbing and saying, "The Devil wants me to hurt you." The guard controlled the situation by having Allies pray. Shortly after this incident, the defendant was injected with sodium amytal and interrogated. Allies made several incriminating statements during the amytal interview and was convinced to confess the next day by Dr. Hughett.

On December 13, 1976, defendant was charged with four counts of deliberate homicide. Allies was transported to the maximum security unit of Warm Springs State Hospital on December 23, 1976, where he remained for approximately six weeks. During this period defendant's girlfriend, Cathy Terry, visited him frequently. On each occasion she extensively questioned the defendant on his involvement in the homicides. In a deposition taken by the Yellowstone County attorney in 1977, she stated that the defendant told her on one occasion that he "thought he was involved. He said he did not know how. He did not know why. But he thought he had used his own gun to shoot."

Following defendant's stay at Warm Springs, his motion to suppress the confession given to the police and the evidence to which it led was denied by the District Court. The trial was commenced and he was convicted of four counts of mitigated deliberate homicide. This Court reversed on appeal basically finding that the confession was involuntary due to psychological coercion and that it was obtained in contravention of defendant's right to counsel. The defendant was entitled to suppression of his invo-

- 6 -

luntary confession and all evidence obtained as a result of the confession under the "fruit of the poisonous tree" doctrine.

Upon remand, the defendant immediately moved to suppress the .22 caliber cartridges and the alleged statement made to Cathy Terry during defendant's incarceration at Warm Springs. The alleged statement was not introduced in the first trial as a result of a stipulation entered into between the Yellowstone County Attorney and the defense counsel. The county attorney agreed not to attempt to introduce the statement if defense counsel would not pursue his theory of a common-law marriage between the defendant and Cathy Terry.

In addition to the facts previously stated, the Yellowstone County District Court also considered testimony concerning the defendant's mental condition in the 1980 suppression hearing.

Dr. Hughett testified that on the basis of what he had been told prior to his discussion with Allies on December 9 and on the basis of the discussion itself, the defendant "could voluntarily and with knowledge waive his rights and give permission for the search," in his expert opinion.

The detectives, Trimarco and Bell, testified that Allies appeared to be normal physically, rational, and not under the influence of alcohol or drugs. Two other police officers who saw the defendant briefly during the interrogation submitted similar testimony.

In addition, the District Court considered testimony concerning the defendant's mental condition at the time of this interrogation which contradicts the testimony of Dr. Hughett. Detective Bell stated that he believed the defendant was "not very stable mentally" at the time of the interrogation, based on his statements concerning witchcraft and his "blackouts." Bell filed a written report on December 12, 1976, that the defendant was mentally unstable and admitted that it was a "pretty rare occasion" for him to note a mental condition.

Considerable psychiatric testimony was also presented to the District Court. Dr. Rich testified that he believed that the defendant was "involved in multiple drug abuse" during the time surrounding December 9, based on infected needle marks and the quantity and quality of drugs and paraphernalia discovered in the search of defendant's van and residence. He also stated that he had diagnosed defendant's condition as a "Borderline Personality Disorder", and that "[e]ven in the absence of drug abuse and/or drug dependence, such a person with this type of personality disorder has difficulties with judgment, long-term planning, and with understanding the natural results of his own behavior or decisions." He concluded that Allies "was not capable of using good judgment to make a decision to sign a waiver to allow his property to be searched." Dr. Rich also testified that Allies' probable drug abuse was not inconsistent with the detectives' testimony that he appeared normal between the period of 11:00 a.m. and 3:45 p.m. on December 9, 1976. Katherine Gallagher, a clinical psychologist employed at Warm Springs, prepared a psychological evaluation of the defendant. She concluded that Allies was "suffering from mental illness; namely schizophrenia, paranoid type, - and from his apparent drug addiction." Her testimony indicates that Allies was unable to follow through with his decisions or make his needs or wants known--"he was easily led." Mrs. Gallagher stated that the defendant would not have been able to waive his constitutional rights in a knowing, intelligent or voluntary fashion in signing a consent to search considering his mental illness, even without coercion or drug dependence. She further stated that the stressful situation at the police station would have made him more disturbed than he might have ordinarily been. Another psychiatric expert, Dr. Alexander, basically concurred with Mrs. Gallagher's testimony, and added that considering the authoritative environment of the police station interrogation and the accusatory nature of the questioning,

Allies would feel threatened to a reasonable psychiatric certainty.

Judge Luedke entered his orders suppressing the .22 caliber cartridges and the alleged statement made to Cathy Terry on June 11, 1980. He found that the prosecution had not sustained its burden of proving that the written consent to search was given voluntarily. It was also determined that the alleged statement made to Cathy Terry was inadmissible under the "cat out of the bag" doctrine.

We consider the following issues on appeal:

1. Whether the District Court erred in finding the written consent to search executed by the defendant on December 9, 1976 involuntary?

2. Whether the District Court erred in concluding that defendant's admission to Cathy Terry must be suppressed under the "cat out of the bag" doctrine?

We first address the issue of whether the District Court erred in suppressing the .22 caliber cartridges which were discovered upon a search conducted with the written consent of the defendant.

> "It is well settled under the Fourth and
> Fourteenth Amendments that a search conducted
> without a warrant issued upon probable cause is
> 'per se unreasonable . . . subject only to a few
> specifically established and well delineated
> exceptions.' Katz v. United States, 389 U.S.
> 347, 357. . . [O]ne of the specifically
> established exceptions . . . is a search con-
> ducted pursuant to consent . . ." Schneckloth v.
> Bustamonte (1973), 412 U.S. 218, 219, 93 S.Ct.
> 2041, 2043-2044, 36 L.Ed.2d 854, 858.

Pursuant to Schneckloth, when the prosecution seeks to rely upon consent to justify the lawfulness of a search, it has the burden of proving that the consent was freely and voluntarily given. The test applied to determine the voluntariness of consent to search is the same as applied to determine the voluntariness of a confession. "In determining whether a defendant's will was overborne in a particular case, the [United States Supreme] Court has

- 9 -

assessed the totality of the circumstances--both the characteristics of the accused and the details of the interrogation." In looking to the factual circumstances surrounding the confession, a court must assess the psychological impact on the accused and evaluate the legal significance of how the accused reacted. Schneckloth, 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862.

Since the test applied to determining the voluntariness of a confession and the voluntariness of consent to search are the same, this Court's decision in Allies I should control the disposition of this issue. In discussing the involuntariness of Allies' confession this Court stated:

> "Whether or not defendant was 'in custody' during the December 9 interrogation by Officers Bell and Trimarco is not pertinent to a determination of whether his ultimate confession was voluntary and thus admissible. The circumstances of that session are, however, relevant as coercive factors which figure in determining if, in the totality of circumstances, the confession is voluntary. Many of the factors have been judicially condemned as coercive in nature. See generally Miranda, 384 U.S. at 445-58, 86 S.Ct. at 1612-19, 16 L.Ed.2d at 707-14. These factors include keeping the suspect incommunicado in a small room; isolating the suspect in a hostile police environment; the mean cop--nice cop interrogation technique; and, the guilt assumption technique of interrogation. The factors do not, of themselves, render the confession involuntary; they must merely be considered in the totality of circumstances. The effect of most of the above variables and interrogation techniques on the final calculus is diminished by the time lag between the initial questioning on December 9 and the confession. Also entering into our analysis is the fact that, for the most part, the above-described circumstances and methods were not repeated after December 9.
>
> " . . .
>
> "Two variables weigh heavily in our consideration. The first, lying to defendant about how much is known about his involvement in the crimes, is particularly repulsive to and totally incompatible with the concepts of due process embedded in the federal and state constitutions. The effect is particularly coercive and in this case is not lessened by the time lag between the initial interrogation and the confession.
>
> "The second factor to which we give weight is the 'subtle' psychological pressure which was exerted on Allies from the time he first talked with Bell and Trimarco until the time he confessed. The pressure

of which we speak lies in leading defendant to believe his problem was 'medical or psychiatric rather than criminal.' It began on December 9 when Bell and Trimarco gave defendant their opinion about his situation and told him he could get help, possibly at Warm Springs. The pressure was kept up, and the idea that his problem was psychological was reinforced later on the 9th in the initial contact with Dr. Hughett." 606 P.2d at 1050-1051, 36 St.Rep. at 2361-2362.

In addition to the evidence of the police procedures utilized on December 9, 1976, the District Court also was presented with extensive testimony related to the defendant's mental condition at the time he executed the written consent to search.

As previously discussed, the expert testimony of several psychiatrists reveals that even absent the coercive aspects of the interrogation and the defendant's drug dependence, there is doubt that the defendant was capable of voluntarily and knowingly consenting to the search. This testimony reveals that the defendant was suffering from a mental disorder which may have prevented him from making a rational decision to waive his constitutional rights. This condition also was not completely unknown to the Billings Police Department. On November 30, 1976, Allies became "squirrely" during a polygraph examination and by the end of the interview he was "talking to the walls" and was "completely out of it." On December 9, 1976, prior to consenting to the search, he told the officers of his heavy drug use; that he believed the "Space Brothers" had landed in Wyoming and were exerting an evil influence over him; that he believed in witchcraft; and, that his ex-wife was a witch who had placed on evil curse on him. Furthermore, after the intense interrogation and the use of the previously condemned police techniques, the defendant became very depressed, began to sob, and threatened to commit suicide.

In contrast to the testimony of Dr. Rich, Dr. Alexander and Mrs. Gallagher, several police officers and Dr. Hughett testified that the defendant appeared to be rational and normal physically. It is the State's position that the District Court

completely ignored the testimony of the police officers and Dr. Hughett. It is asserted that these witnesses were the only people who were in contact with Allies on the date in question and as a consequence, their testimony should be given considerable weight. The prosecution contends that the District Court abused its discretion in not attaching great weight to Dr. Hughett's testimony, since he was the only medical expert to come in contact with the defendant on December, 9, 1979.

Prior to discussing the standard of review, it is worthwhile to note that a defendant's mental condition at the time of executing a consent to search is a factor to be considered in the totality of the circumstances. As was stated in Schneckloth:

> "Just as was true with confessions, the requirement of a 'voluntary' consent reflects a fair accommodation of the constitutional requirements involved. In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches. In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of 'voluntariness.'" 412 U.S. at 229, 93 S.Ct. at 2048-2049, 36 L.Ed.2d at 864.

Turning to the standard of review in the present appeal, we reiterate our discussion in Allies I:

> "In reviewing suppression proceedings, we are governed by the following well-settled principles:
>
> "'When a motion to suppress is presented to a trial court, its analysis of the evidence presented at the pretrial hearing must focus on whether impermissible procedures were followed by law enforcement authorities. The burden of proof of voluntariness is upon the State, and it is required to prove voluntariness by a preponderance of the evidence but not beyond a reasonable doubt. [Citations omitted.]' State v. Smith (1974), 164 Mont. 334, 338, 523 P.2d 95, 97; see also Lego v. Twomey (1972), 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618.

> "'The question of voluntariness largely depends upon the facts of each case, no single fact being dispositive . . . The determination of voluntariness, rather, depends upon the "totality of the circumstances." [Citations omitted.]' State v. Lenon (1977), 174 Mont. 264, 570 P.2d 901, 906, . . . see also Greenwald v. Wisconsin (1968), 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77; Gallegos v. Colorado (1962), 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325, 87 ALR2d 614; State v. Lucero (1968), 151 Mont. 531, 538, 445 P.2d 731, 735.
>
> "We emphasize that the issue of voluntariness is a factual one addressed to the discretion of the trial court. State v. White (1965), 146 Mont.
>
> 226, 234-35, 405 P.2d 761, cert. denied 384 U.S. 1023, 86 S.Ct. 1955, 16 L.Ed.2d 1026. We do not sit as triers of fact; nor do we lightly disturb the trial court's decision.
>
> "Smith and Lenon make it clear that the standard to be applied by the trial judge on a suppression of admissions question is 'preponderance of the evidence', but when the same question comes to us on appeal to the credibility of the witnesses and the weight to be given their testimony is for the trial court's determination and our review is limited to determining whether there is substantial credible evidence supporting the District Court's findings. State v. Grimestad (1979), ____ Mont. ____ , 598 P.2d 198, 203, 36 St.Rep. 1245, 1251."
> 606 P.2d at 1049-1050, 36 St.Rep. at 2359-2360.

The "totality of the circumstances" in the present case includes not only the police techniques employed on December 9, 1976, which we have already found particularly coercive but also the testimony presented of the defendant's mental condition.

Again, the burden of proof rests on the State to prove voluntariness and this must be shown by a preponderance of the evidence. The District Court found that the prosecution had not sustained its burden and on the basis of the record there can be no doubt that substantial evidence exists to support that finding.

Next, the State contends that the District Court erred in suppressing the alleged statement made by the defendant to Cathy Terry under the "cat out of the bag" doctrine. This doctrine is applied in cases where an inadmissible confession is obtained and subsequently the defendant makes other inculpatory statements. The United States Supreme Court has summarized the doctrine as follows:

> "Of course, after an accused has once let the
> cat out of the bag by confessing, no matter
> what the inducement, he is never thereafter free
> of the psychological and practical disadvantages
> of having confessed. He can never get the cat
> back in the bag. The secret is out for good.
> In such a sense, a later confession always may
> be looked upon as fruit of the first. . . ."
> United States v. Bayer (1947), 331 U.S. 532,
> 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654, 1660.

This constitutional doctrine does not always result in an abso-
lute bar of the subsequent admission. The later inculpatory sta-
tements may be rendered admissible if the prosecution
demonstrates that there is a "break in the stream of events . . .
sufficient to insulate the final events from the effect of all
that went before." Darwin v. Connecticut (1968), 391 U.S.
346, 349, 88 S.Ct. 1488, 1490, 20 L.Ed.2d 630, 634; See Beecher
v. Alabama (1967), 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35. In
Bayer, the Court found that the taint had been removed by the
defendant's subsequent freedom from custody and the passage of
six months.

In the present case the Billings Police Department
obtained an inadmissible confession on December 12, 1976, while
Allies was in custody at the psychiatric ward of Deaconess
Hospital. He was removed to the maximum security unit of Warm
Springs State Hospital on December 23, 1976. The alleged state-
ment made to Cathy Terry occurred approximately six weeks later
in response to Terry's persistent questioning. The record
reveals that Cathy Terry visited defendant approximately 42 times
within a 19-day period in January and February, 1977.

The prosecution contends that the following factors remove
the taint of the original confession: (1) Passage of time - the
defendant's original confession occurred on December 12, 1976,
and his subsequent admission was induced in late January or early
February of 1977; (2) Change in location - the original con-
fession was made in the psychiatric ward of the Deaconess
Hospital in Billings while the later admission occurred at the

- 14 -

maximum security unit of the Warm Springs State Hospital; (3) Manner of interrogation - the first confession was obtained by police officers and a "psychiatrist-investigator" while the subsequent admission was induced by the defendant's mistress, and (4) Representation by counsel - the first confession occurred while defendant was not represented by counsel, however an attorney had been appointed and had consulted with defendant prior to the admission made at Warm Springs.

Defense counsel contends that the controlling factors under the "cat out of the bag" doctrine in the present case are: the defendant's continuous incarceration; the setting of both admissions is very similar--a hospital's psychiatric ward in the first instance and Warm Springs in the later instance; and the defendant was diagnosed as being mentally ill during both time periods which rendered him vulnerable to succumbing to the demands of others. Defendant also points out that the prosecution has the burden of proving a break in the stream of events sufficient to remove the taint of the original confession.

Judge Luedke resolved the issue as follows:

"Weighing the contentions offered, as well as the evidentiary materials before the Court, .

". . . the position of the prosecution is not carried by the preponderance of the evidence. It follows that the defendant's contention that the Warm Springs Hospital admission was a fruit of the prior inadmissible confession is well-taken and his motion must be GRANTED."

We agree.

In reviewing the cases decided under the "cat out of the bag" doctrine, we note that the determination of whether the causative link between the confessions has been broken is essentially a case-by-case factual determination. Although the cases cited by both parties are all factually distinguishable from the present case, with the exception of Bayer these cases have found the cat out of the bag doctrine applicable in excluding the subsequent admission. Darwin v. Connecticut, supra, (one day

- 15 -

break); Beecher v. Alabama, supra, (5 days following "gross coercion"); Clewis v. Texas (1967), 386 U.S. 707, 87 S.Ct. 1338,18 L.Ed.2d 423, (9 days); Commonwealth v. Meehan (1979), ___Mass.___, 387 N.E.2d 527 (spontaneous statement to a family member); Oregon v. Paz (1977), 31 Or.App. 851, 572 P.2d 1036 (immediate phone call to a family member); State v. Cullison (Iowa 1975), 227 N.W.2d 121 (one day break); Williams v. U.S. (5th Cir. 1964), 328 F.2d 669 (one-month break). These cases all place the burden of proof upon the prosecution. As previously stated, Bayer involved a six-month break between the confessions, and at the time of the subsequent admission the defendant was not in custody.

Our discussion of the standard of review under the first issue in this appeal applies with equal weight to this issue. In short, substantial credible evidence exists to support the District Court's finding that the prosecution failed to sustain its burden of proof. In reaching this holding, the circumstances of defendant's continuous incarceration and the frequent, persistent questioning by Cathy Terry weigh heavily.

The District Court's order granting suppression of the .22 caliber cartridges and the alleged statement to Cathy Terry is affirmed.

_____
Chief Justice

We concur:

_____

_____

_____
Justices

- 16 -

_____

Hon. Peter G. Meloy, District
Judge, sitting in place of Mr.
Justice John C. Sheehy.

Mr. Justice John Conway Harrison dissenting:

I must respectfully dissent to the holding of the majority opinion.

I do so on the basis of the second confession made by defendant during the period of some six weeks when he was a patient at the Warm Springs State Hospital. As noted in the majority opinion, his live-in lady friend, Cathy Terry, visited him frequently while he was a patient at Warm Springs. On each occasion she questioned defendant as to his involvement in the murders of the four members of the Tillotson family. In a deposition taken by the Yellowstone County attorney in 1977, she stated that the defendant told her on one occasion that he "thought he was involved. He said he did not know how. He did not know why. But he thought he had used his own gun to shoot."

Following reversal by this Court of his first conviction, defendant immediately sought suppression of his involuntary confession and all evidence obtained as a result of that confession under the "fruit of the poisonous tree" doctrine. This included the suppression of .22 caliber cartridges and the above-mentioned statements made to Cathy Terry during his incarceration at Warm Springs. (I point out here that the alleged statement was not introduced at the first trial as a result of a stipulation entered into between the Yellowstone County attorney and defense counsel. The county attorney agreed that he would not attempt to introduce the statement if defense counsel did not pursue

his theory of a common-law marriage between defendant and Cathy Terry.) The District Court, as noted by the majority, suppressed the admission made to Cathy Terry under the "cat out of the bag" doctrine.

I do not find that the incriminating statement made by defendant was "fruit" of his alleged illegally obtained confession.

The "fruit of the poisonous tree" doctrine was first set forth by the United States Supreme Court in Silverthorne Lumber Co. v. United States (1920), 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1429. In Silverthorne a federal agent seized documents, photographed them, and then returned them to the defendant. The Court held that the use of the photographs at trial was improper:

> ". . . The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. . . If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed. . ." 251 U.S. at 392.

Later, in Nardone v. United States (1939), 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307, the Court qualified the rule of Silverthorne by noting that although there might be a casual connection between the "poisoned tree" and the evidence offered at trial, the "connection may become so attenuated as to dissipate the taint."

In Wong Sun v. United States (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, the Supreme Court clarified its application of the "fruit of the poisonous tree." In Wong Sun the Court set forth a two-part test to determine whether a subsequent discovery of evidence is tainted with the

primary illegality: (1) the exclusionary rule has no application where the government learns of the evidence "from an independent source;" and (2) the exclusionary rule has no application where the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint.

The United States Supreme Court indicated that all evidence is not "fruit" simply because it would not have come to light but for the illegal actions of the police. Rather, the controlling question is, ". . . whether, granting the establishment of a primary illegality, the evidence to which the instant objection is made has been come at by exploration of that illegality or by means sufficiently distinguished to be purged by the primary taint. . ." See McQuire, Evidence of Guilt, §222.

While the Supreme Court has failed to elaborate on what is meant by the "independent source" language of Wong Sun, the lower federal courts and many state courts have interpreted the term in various ways to develop exceptions to the "fruit of the poisonous tree" doctrine. Many courts have accepted the "inevitable discovery" exception to the fruit of the poisonous tree. See The Inevitable Discovery Exception to the Constitutional Exclusionary Rules, 74 Columbia L. R. 88, 90 (1974).

A reading of the cases indicates that the prosecution may succeed in removing the taint when it can be established that the incriminating evidence would have been discovered in absence of the illegal police conduct. The burden of proof of that showing rests upon the State. See Alderman v. United States (1969), 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176. The problem often arising in the case of confessions

is the effect of the inadmissible confession upon subsequent confessions. The courts have developed certain criteria which they utilize to determine if the second confession is, under the Wong Sun test, purged from the primary taint of the first confession.

A frequently cited decision in this area which best reflects the current state of the law is United States v. Bayer (1947), 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654. In Bayer, which I feel is controlling in this case, the Court dealt with the admissibility of a second confession obtained from the defendant six months after the inadmissible confession. The Court upheld the admissibility of the second confession, emphasizing that the defendant (1) had made the second confession six months after the first; (2) was not under any sort of restraint in his freedom during the time; and (3) had received a fair warning that the second confession might be used against him. However, the court noted:

> ". . . after an accused has once let the cat
> out of the bag by confessing, no matter what
> the inducement, he is never thereafter free
> of the psychological and practical disadvan-
> tages of having confessed. He can never get
> the cat back in the bag. The secret is out
> for good. In such a sense, a later confes-
> sion always may be looked upon as fruit of
> the first. But this Court has never gone so
> far as to hold that making a confession under
> circumstances which preclude its use, perpe-
> tually disables the confessor from making a
> usable one after those conditions have been
> removed. . ." 331 U.S. at 540-541.

The alleged statements of defendant do not appear to me to be of a kind which warrants exclusion under any rule. In my opinion, there exists no good reason why a second jury should not have been allowed to hear that evidence.

John Conway Harrison  
Justice