No. 84-373

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

BARRY ALLAN BEACH,

Defendant and Appellant.

APPEAL FROM: District Court of the Fifteenth Judicial District,
In and for the County of Roosevelt,
The Honorable M. James Sorte, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Moses Law Firm; Richard Carstenson argued, Billings,
Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Clay Smith argued, Asst. Atty. General, Helena
James A. McCann, County Attorney, Wolf Point,
Montana

Submitted: March 13, 1985

Decided: July 25, 1985

Filed: JUL 25 1985

*Ethel M. Harrison*

Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Defendant appeals from a denial of his motion to supress, motion for change of venue, jury verdict of guilty of deliberate homicide, and sentence imposed thereon; all rendered in the District Court of the Fifteenth Judicial District, Roosevelt County, Montana. We affirm.

On June 16, 1979, the body of Kimberly Nees was discovered in the Poplar River near Poplar, Montana. She had been bludgeoned to death. The Roosevelt County Sheriff's Office investigated the crime, but was unable to make an immediate arrest. High on the list of suspects was the defendant, Barry Allen Beach.

Several years later, on January 4, 1983, the Ouachita Parish, Louisiana, Sheriff's Office received a complaint from Carolyn Beach, Barry Beach's step-mother. She alleged that the defendant, then living in Monroe, Louisiana, had picked-up two under age girls from school and that they had not returned. Deputy Talmadge Stutts responded to her complaint, and went to the defendant's house. The defendant admitted that both girls had been there earlier in the day, but had gone home. Stutts then advised the defendant of his Miranda rights, and asked if he could inspect the apartment. According to Stutts, the defendant consented to the search. The defendant later testified at a suppression hearing that he did not give Deputy Stutts permission to enter his apartment. Stutts entered, and following the search, arrested defendant on the charge of contributing to the delinquency of minors. He then took the defendant to the Ouachita Parish Sheriff's Office.

2

That night, defendant signed a Miranda waiver form and gave a statement regarding the contributing charge. He spent the night in jail. The next day, January 5, defendant telephoned his mother, Roberta Clincher, in Poplar, Montana and advised her of his arrest. Mrs. Clincher then contacted Tim Beach, the defendant's uncle, who was also in Monroe, Louisiana, to see about getting the defendant out of jail.

The defendant also contacted his step-mother, Carolyn Beach, and allegedly threatened to kill her for complaining to the Sheriff's Office. Mrs. Beach reported the threat to Alfred Calhoun, the Commander of the criminal investigation unit of the Ouachita Parish Sheriff's Office. She also told Commander Calhoun that the defendant was a suspect in the Nees murder in Montana. The Louisiana authorities contacted the Roosevelt County Sheriff and confirmed Mrs. Beach's report. They also indicated to the Roosevelt County Sheriff that Barry Beach was a suspect in three murders in Louisiana.

On January 6, 1983, Louisiana investigators began to question Barry Beach. Sergeant Jay Via first interviewed the defendant after giving him Miranda warnings and having a waiver signed. Sergeant Via testified at the supression hearing that the January 6 interview lasted approximately one hour, from 11:00 a.m. to 12:05 p.m. The defendant testified that this interview commenced at 7:30 a.m. and lasted four hours.

At the time of the first interview, defendant was still being held on the contributing charge. That afternoon, Geary Aycock, an assistant district attorney for Ouachita Parish requested the Sheriff's Office to release the defendant. Sergeant Via told Aycock about the death threat and the Nees murder in Montana. On this basis, Aycock authorized

3

continued custody of the defendant. Bail remained set at $1,500, the amount previously set for the contributing to the delinquency of minors charge.

That afternoon, Tim Beach came to the Ouachita Parish Correctional Center to post bail for the defendant. Tim Beach spoke to Sergeant Via, and Via testified that he told Tim that he had a right to post bond, but that because of the death threats, the defendant's step-mother and father desired that Barry Beach remain in custody. Tim Beach testified that Via explained to him the procedure to get psychiatric help for Barry Beach, and also told him that getting a lawyer would be "a waste of money." Via denied making any specific recommendations to Tim Beach.

Via arranged a phone conversation between Tim Beach and the defendant during which the defendant allegedly told Tim that he did not wish to be bailed out. Tim Beach later talked in a three-way conference call that included Sergeant Via, to his mother, Mrs. Clincher, who at that time indicated that she was "content" with the defendant remaining in jail. She testified that she assented to this because Sergeant Via had assured her that the defendant would be provided with psychological help, and that he would be released soon anyway.

Tim Beach also testified that he remembered talking to an assistant district attorney who told him that the defendant would be released if taken back to Montana. The assistant district attorney allegedly told Tim Beach to wait in the courthouse for the defendant's release. Tim did so, but several hours later received word that other charges were being brought against the defendant, and that he was also being investigated for murder. Tim Beach could not say

4

whether these last events occurred on January 6 or 7, but the record shows two things; first that charges against the defendant for deliberate homicide were not brought until January 8, and second that no bond was posted for the defendant on January 6. The record also shows that the defendant had not yet been taken before a judge or magistrate for an initial appearance, arraignment, or proceeding.

The questioning of Barry Beach continued at 12:30 p.m. on January 7. This interview concerned the three Louisiana murders, and the Nees murder in Montana. Sergeant Via again did the questioning. He gave the defendant Miranda warnings and received a signed waiver thereof. He testified that the defendant was coherent and comfortable in the interrogation room. Via interrupted the interview once, when another deputy entered the room, to give the defendant another Miranda warning and to obtain another waiver. At approximately 2:30 p.m. the defendant authorized Sergeant Via to conduct a stress evaluation test. Via conducted the test and found stress indicative of deception. Because of this, Via requested Commander Calhoun to conduct another test. Commander Calhoun, after giving more Miranda warnings, did so using a different form of questioning. Testimony varies as to what occurred at this point, but according to the defendant, he was left alone with Commander Calhoun, who first conducted the test, and then accused him of lying. The defendant also testified that Commander Calhoun was abusive, and threatened him, telling him that he was going to "fry in the electric chair." Commander Calhoun denied using any such tactics, stating that all he did was administer the test and tell Barry Beach that his responses indicated deception. The Commander further testified that after he told the defendant

5

his answers were apparently untruthful, Beach broke down and began to talk about the Nees murder.

Sergeant Via re-entered the interview room at approximately 7:00 p.m. and Commander Calhoun left. When Via came into the room, Barry Beach was broken down and crying. He began talking and admitted murdering Kimberly Nees. Via had Calhoun return to the interview room, and had the defendant sign another Miranda waiver. They then tape recorded an interview with the defendant in which he described in detail facts, not known by the general public, concerning the murder of Kimberly Nees.

On January 8, the defendant retained counsel. On January 11, the defendant, his attorney, Sergeant Via, and Joe Cummings, a deputy sheriff, held a conference. Defendant was given Miranda warnings, and signed a waiver thereof. During this meeting, the defendant again admitted he murdered Kimberly Nees, but denied any involvement in the unsolved Louisiana murders.

During this time the investigators in Louisiana had been in contact with the Roosevelt County Sheriff's Office. On January 8, 1983, the Roosevelt County Attorney filed a petition in the youth court for the Fifteenth Judicial District, Roosevelt County, seeking a declaration that the defendant, then 20 years old, was a delinquent youth, and requesting authority to incarcerate him. The county attorney simultaneously filed a motion to transfer the youth court proceedings to District Court. This motion was not ruled upon before defendant turned 21. The District Court issued an order of detention and, for extradition purposes, a finding of probable cause.

6

The defendant turned 21 years of age on February 15, 1983. On April 29, 1983 his Montana attorneys filed a motion to dismiss the youth court action. The basis for the motion was the loss of youth court jurisdiction over the defendant under section 45-5-205(3), MCA, at the time he reached the age of 21. The defendant's motion was granted by order dated May 4, 1983. Defendant had been charged in District Court on May 3, 1983.

The defendant was extradited back to Montana in August of 1983 and was tried on April 9, 1984 in Glasgow, Valley County, Montana. Valley County is adjacent to Roosevelt County. On April 13, 1984, the jury returned a verdict of guilty of deliberate homicide. On May 11, 1984 judgment was entered on the conviction and Barry Beach was sentenced to a term of 100 years in the Montana State Prison. The court also determined the defendant to be ineligible for designation as a non-dangerous offender and further determined that he would be restricted from eligibility for parole and release programs while serving his term. Barry Beach appeals his conviction and sentence to this Court, presenting the following issues for review:

(1) That the District Court did not have jurisdiction to try Barry Beach for deliberate homicide.

(2) That the District Court erred in not changing venue to a county outside of the primary news coverage area of the same media that prejudicially affected his rights to a fair trial in Roosevelt County, Montana.

(3) That the District Court erred in not suppressing the confession Barry Beach made to the Louisiana authorities.

(4) That the District Court erred in not instructing the jury that it must find the defendant possessed a specific mental state, in order to convict him.

(5) That the sentence imposed was harsh, oppressive, cruel and unusual, and an abuse of the District Court's discretion.

## Issue #1

Appellant contends that the District Court lacked jurisdiction to try him. As authority, he points to section 41-5-203, MCA, which states:

> "Jurisdiction of the court. (1) Except as provided in subsection (2), the court has exclusive original jurisdiction of all proceedings under the Montana Youth Court Act in which a youth is alleged to be a delinquent youth, a youth in need of supervision, or a youth in need of care or concerning any person under 21 years of age charged with having violated any law of the state or ordinance of any city or town other than a traffic or fish and game law prior to having become 18 years of age." (Emphasis added.)

and to section 41-5-205, MCA which states:

> "Retention of jurisdiction. Once a court obtains jurisdiction over a youth, the court retains jurisdiction unless terminated by the court or by mandatory termination in the following cases:
>
> "(1) at the time the proceedings are transferred to adult criminal court;
>
> ". . .
>
> "(3) in any event, at the time the youth reaches the age of 21 years." (Emphasis added.)

The defendant argues that the District Court lacked jurisdiction because he was under the age of 18 when the crime was committed and the youth court proceedings instituted on January 8, 1983 were never transferred under

8

section 41-5-206(1), MCA, to the District Court prior to his reaching of age 21 on February 15, 1983. He contends that once the "exclusive jurisdiction" of the youth court has attached under section 45-5-203(1), MCA, the District Court can never assume jurisdiction over the offense underlying the youth court's proceeding absent transfer pursuant to section 45-5-206(1), MCA.

We do not find the defendant's argument to be pursuasive. In State ex rel Elliot v. District Court (Mont. 1984), 684 P.2d 481, 41 St.Rep. 1184, we held that there is no "window" of jurisdiction between the youth court act and the general district court jurisdiction. Furthermore, in dicta, Elliot, supra, addresses the situation at issue here and resolves it in favor of jurisdiction resting in the district court.

In Elliot, the defendant committed a murder when he was 15½ years old. His involvement in the murder was not discovered until several years later when he was 22 years of age and had voluntarily confessed. The defendant argued that the youth court act provides for "exclusive original jurisdiction" over juvenile offenses, and allows the juvenile court to transfer jurisdiction to the district court only under certain circumstances as provided for in section 41-5-206, MCA. Since the defendant in Elliot never came under the exclusive original jurisdiction of the juvenile court, he contended that transfer to District Court could not be effected.

In Elliot we held that the "exclusive original jurisdiction" of the youth court depended upon on two factors: (1) that the offense was committed while the youth was under the age of 18; and (2) that the youth was charged

9

before the age of 21. In this case, Barry Beach was clearly under the exclusive original jurisdiction of the juvenile court. In Elliot this Court held that since he had committed a crime he came under the jurisdiction of the District Court pursuant to Art. VII, Sec. 4 Mont. Const., even though he was not under the exclusive original jurisdiction of the youth court.

In Elliot this Court cited a case from Minnesota, In the Matter of the Welfare of S.V. (Minn. 1980), 296 N.W.2d 404, that is very closely on point with the case at bar. In In Matter of the Welfare of S.V., the 17 year old defendant was charged with homicide in juvenile court. The case dragged on in juvenile court for over four years and the court lost jurisdiction (pursuant to a clause in the Minnesota Code similar to section 41-5-205(3), MCA) because the offender turned 21. At age 22, the county sought to prosecute the defendant in district court. Defendant made this argument:

> ". . . the respondent is attempting to take advantage of an alleged loop-hole in the juvenile court's statutes. Minn. Stat. sec. 2260.111 . . . provides that juvenile courts have original and exclusive jurisdiction over offenses committed by persons under age 18 unless the case is referred by the juvenile court for adult prosecution. . . However . . . juvenile court jurisdiction ends for all purposes at age 21. The respondent urges that the juvenile court lacks jurisdiction because he is over 21, and the district court lacks jurisdiction because there has been no juvenile court referral of the juvenile act. The respondent thus argues that he cannot now be prosecuted anywhere." 296 N.W.2d at 407

This Court went on to further quote from the Minnesota court as follows:

"We believe it would ridiculous to say
that if a person of 16 or 17 years of age
commits a murder and escapes detection or
apprehension either on a warrant or
indictment until after he reached 18
years of age, or 21 years under the
recent changes, he could no longer be
proceeded against in juvenile court or
tried by the district court
. . . [Court's emphasis deleted.]

"[The defendant's] interpretation would
be in violation of [the Minnesota
constitution] which gives the district
court original jurisdiction in all
criminal cases, and it would be
unreasonable and absurd. The legislature
does not intend a result that is absurd
or in violation of the constitution."
296 N.W.2d at 407

The conclusion in Elliot supports the State's argument in

this case. Exclusive original jurisdiction in the juvenile

court does not divest a district court of jurisdiction over

crimes committed by the juvenile defendant. It merely allows

a juvenile to be treated, if the circumstances so permit, as

a juvenile, and benefit from a less punitive and retributive

system than provided in the district courts. The defendant

argues that this holding will vest in the prosecutor the

power to conclusively determine the forum merely by dragging

his feet in prosecuting the crime. This is a valid

observation, but misses one point; juveniles, as well as

adults, benefit from the right to a speedy trial.

We hold that upon termination of the youth court

jurisdiction, no bar existed to the exercise of the district

court's jurisdiction under Article VII, section 4(1) of the

Montana Constitution and sections 3-5-302(1)(a) and 46-2-201,

MCA, over felony criminal proceedings against the defendant.


Issue #2

11

The District Court granted defendant's motion for change of venue, but, over defendant's objection placed venue in adjacent Valley County. Section 46-13-203, MCA is the statue that allows a trial court to change venue in criminal cases. It states in pertinent part:

" . . .

"(3) If the court determines that there exists in the county in which the prosecution is pending such prejudice that a fair trail cannot be had, it shall:

"(a) transfer the cause to any other court of competent jurisdiction in any county in which a fair trial may be had . . . " (Emphasis added.)

The defendant's motion, supported by affidavit and other evidence, alleged wide spread media exposure of the facts involving the death of Kimberly Nees, and the prejudicial information published about Beach's confession. The District Court found that the motion had merit, and ordered that the trial should be moved to adjacent Valley County. The defendant objected and moved again for a change of venue contending that the same prejudice existed in Valley County as in Roosevelt County. As authority defendant cited State ex rel Dryman v. District Court (1954), 128 Mont. 402, 276 P.2d 969, where he argued that this Court implicitly recognized the pervasive, prejudicial nature of region-wide media coverage in rural Montana and ordered a new trial to be had in a county non-adjacent to the original county.

The District Court denied the defendant's second motion for change of venue and ordered the trial to be held in Valley County at Glasgow, Montana. In denying this motion the District Court stated:

"The motion to move the venue again is dismissed, denied and overruled, but the

12

> court will reconsider the entire matter
> and change the venue if the selection of
> jurors in Valley County indicates the
> defendant cannot receive a fair trial in
> that county."

This Court will not overturn a District Court order granting or denying a motion for change of venue unless such action is found to be arbitrary or capricious, or, in other words, an abuse of discretion. State v. Link (Mont. 1981), 640 P.2d 366, 38 St.Rep. 982; Bashor v. Risley (D.C.Mont. 1982), 539 F.Supp. 259, aff. 730 F.2d 1228.

We hold that the District Court did not act improperly in denying defendant's second motion for change of venue. In so ordering, the District Court acted reasonably in balancing the competing considerations of cost and inconvenience to Roosevelt County of holding a trial at a distant venue, with the defendant's right to a fair trial.

All that section 46-13-203(3)(a), MCA requires is that when venue is changed, it be to a county "in which a fair trial may be had." This question is primarily factual. The defendant presented several allegedly prejudicial newspaper articles to the District Court, one in which the county prosecutor purportedly told the Governor that the defendant would be unable to get a fair trail anywhere in eastern Montana. The court apparently did not find factual support for defendant's allegation of area-wide prejudice, and moved the trial to the next county. But, recognizing defendant's concerns, the District Court in its order denying the second motion for change of venue expressly provided that if, at the time of jury selection, it became apparent that a fair and impartial jury could not be had in Valley County, the motion would be reconsidered. As the case came to trial and the

13

jury selected, defendant did not renew his allegation of prejudice. He, at that time, waived this objection.

The Dryman, supra, case which defendant cites is in accord with this decision. In Dryman, this Court directed the district court to change the venue of a criminal trial to a county "not adjacent" to the original county because a fair trial could not be had in any adjacent county. Addressing that point, this Court stated:

> "This court's sole purpose in directing that relators new trial be had in same county 'not adjacent' to Toole County was to secure him the fair trial by an impartial jury which is guaranteed to every person charged with a crime by our Constitution." 128 Mont. at 406, 276 P.2d at 971.

Dryman, supra, supports the rule that the key to the venue inquiry is where a fair trial may be had. Absent an abuse of discretion, a district court's determination thereof will not be disturbed. We affirm on this point.


Issue #3

As framed by the appellant, issue #3 presents four sub-issues. All of them revolve around the admissibility of the confessions Barry Beach made to the Louisiana authorities. Defendant points out four grounds upon which he contends that the confessions are inadmissible. They are:

A. That such statements were obtained as a result of defendant's arrest in his home without a warrant.

B. Such statements were obtained after the defendant was denied his constitutional right to release on bail.

C. Such statements were obtained after the defendant was denied his right to be taken before a magistrate or a judge and arraigned and advised of his rights.

14

D. That the State failed its burden of proving the voluntariness of the statements.

We address these issues in the above order.

The defendant was arrested in his home on a charge of contributing to the delinquency of minors. This arrest was affected without a warrant. The United States Supreme Court has clearly stated that, absent exigent circumstances, a warrantless arrest for a minor (misdemeanor or nonviolent) crime cannot be made in the defendant's home without a warrant. Welsh v. Wisconsin (1984), ____ U.S. ____, 104 S.Ct. 2091, 80 L.Ed.2d 732; Payton v. New York (1980), 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639; Harris v. United States (1947), 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; U.S. v. Prescott (9th Cir. 1978), 581 F.2d 1343.

In Brown v. Illinois (1975), 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416, the United States Supreme Court considered the admissibility of incriminating statements made by a defendant shortly after a warrantless arrest without probable cause. The Court held that the propriety of using statements following an improper arrest at trial required separate analysis under both the Fourth and Fifth Amendment:

> "Wong Sun [v. United States (1963), 317 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441] requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint' [Citations omitted.] . . . Wong Sun thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment."

The District Court examined the defendant's contentions and found that the confessions obtained were neither causally connected to the initial arrest nor involuntary.

15

In reviewing the District Court's denial of the defendant's motion to supress we are restricted to examining the record to adduce whether it contains substantial credible evidence to support the findings, and to determine whether those findings were applied correctly as a matter of law, State v. Davison (1980), 188 Mont. 432, 439, 614 P.2d 489, 493; State v. Grimestead (1979), 183 Mont. 29, 598 P.2d 198.

It is a general principle of constitutional law that statements and confessions made as a result of an unlawful incarceration are inadmissible, Taylor v. Alabama (1982), 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314; Wong Sun v. United States, supra. But, there must be some causal connection between the original unlawful detention and the statements made, Taylor, supra at 690, 102 S.Ct. at 2667, 73 L.Ed.2d at 319. The District Court, addressing this connection stated "the State has established that the statements were not the result of an exploitation of that illegality under the attenuation analysis of Wong Sun, supra, Brown v. Illinois [supra,]; [and] Dunaway v. New York [(1980), 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824]." We affirm.

The question under the first prong of this analysis is whether the evidence presented at trial was the result of an exploitation of the original illegality of the arrest. In making this judgment four factors must be considered: (1) the presence or absence of timely Miranda warnings; (2) whether there was an intervening independent act by the defendant or some third party; (3) the temporal proximity of the arrest and statement made; (4) the degree of the alleged Constitutional violation. Brown, supra at 603-04, 95 S.Ct. at 2261-2262, 45 L.Ed.2d at 426-427; Dunaway, supra at 217-18, 99 S.Ct. at 2259, 60 L.Ed.2d at 839.

16

There is substantial credible evidence in the record to support the District Court's conclusion that the defendant's confessions did not come about as a result of any alleged exploitation. First defendant was given ten Miranda warnings and executed several signed waivers thereof. As to the factor of "temporal proximity," the defendant confessed more than three days after his initial arrest. This three day period is substantially longer than the several hour period discussed in Brown and Dunaway. In this regard, the United States Supreme Court's approach is to determine whether there was sufficient time for the defendant to overcome the unsettling affect that the arrest may have initially had, and to give him time to gather his thoughts. Three days appears to be enough time for this to have occurred. Furthermore, the defendant made an additional confession on January 11 in the presence of his attorney, five days after the initial arrest. This also negates any direct causal link between the anxiety causing effect of the arrest and the statement. The death threat the defendant made to Carolyn Beach can clearly be considered to be an intervening act to sever the chain of causality. Furthermore, this threat was a sufficient ground to continue the defendant in custody. As to defendant's allegation of police misconduct, the District Court specifically stated that "there was no police misconduct." Again, though the record may support a differing interpretation, we find there is substantial credible evidence in the record to support this finding.

Secondly, defendant argues that he was denied his "constitutional" right to release on bail. He alleges that Tim Beach went to the Ouachita Parish Correctional Center in order to bail the defendant out and was told by Sergeant Via

17

and an assistant county attorney that Barry Beach would be released the next day, or that it was in the defendant's best interest to stay in jail in order to receive psychological counseling. These representations, defendant contends, had the effect of denying him his right to bail.

Although the District Court did not specifically address this issue, we do not find defendant's argument to be persuasive. Assuming, arguendo, that the defendant had a constitutional right to bail, he does not show how it was denied. Bail had been set for the contributing to the delinquency of minors charge at $1,500 and was available to the defendant at the time. There is no allegation or evidence in the record that Tim Beach or anyone ever tendered bail money on behalf of the defendant. Neither the defendant, nor any of his representatives made any request for his bail to be reduced, or for a release on his own recognizance. By not diligently pursuing this right, he waived it. Furthermore, we simply cannot believe that the defendant was denied any right by several alleged misrepresentations on the part of the Louisiana authorities. In order for the defendant to pursuasively argue that he was prejudiced by an alleged denial of a constitutional right, he first must show that the right was actually denied. In this regard we do not think it unreasonable to hold the defendant to a de minimus level of diligence in pursuing his rights.

Thirdly, the defendant contends that his confession was obtained after he was denied his right to be taken before a magistrate or judge to be arraigned and advised of his rights. The defendant was originally incarcerated on the evening of January 4, 1983 on the contributing charge and was

not brought before a magistrate for several days, until after he made his first confession. The rule in this regard is the "McNabb-Mallory" rule which requires the exclusion of any confession obtained as a result of "unnecessary delay" in the initial appearance. McNabb v. United States (1943), 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Mallory v. United States (1957), 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. The McNabb-Mallory rule is not based on any specific constitutional provision, but rather is a rule of supervisory control over federal courts, and has since been legislatively restricted, see 18 U.S.C. §3501 (1972). In State v. Benbo (1977), 174 Mont. 252, 570 P.2d 894, though, this Court adopted the McNabb-Mallory rule under our own supervisory power. The test as set forth in Benbo is the following:

> "When a defendant bases a motion to suppress evidence upon a claim that he was not provided a prompt initial appearance, the burden is first on the defendant to show the delay was unnecessary. The district court should focus on the diligence of the persons who made the arrest in bringing the defendant before the nearest and most accessible judge. While the length of the time between arrest and initial appearance is not determinative of the 'necessity' of the delay, it is a factor to be considered.

> "Once a defendant has established the delay was unnecessary the burden shifts to the prosecution. The State must show the evidence obtained during the delay was not reasonably related to the delay. Absent such a showing the evidence will be excluded." (Relying on R.C.M. 1947 § 95-603(d)(3), now section 46-7-101, MCA); 174 Mont. at 262, 570 P.2d at 900. See also State v. Dieziger (Mont. 1982), 650 P.2d 800, 39 St.Rep. 1734.

Addressing this point, the District Court stated "the court finds that an unnecessary delay in arraignment was not established and even if it is assumed that there was such a

19

dely, the State has still demonstrated the voluntariness of the defendant's statements by preponderance of the evidence."

Under _Benbo_ the defendant has the initial burden to show that the delay was unnecessary. This Court has applied this first element strictly and denied appeals of lower court denials of supression on motions made on this ground when the defendant failed to show the "unnecessary" nature of the delay. In State v. Plouffe (1982), 198 Mont. 379, 646 P.2d 533, we held that the defendant's burden in this respect is more than just pointing out that the authorities could have presented him earlier. See also State v. Lenon (1977), 174 Mont. 264, 570 P.2d 901. In one case where a similar delay was encountered, i.e. approximately five or six days, this Court found that the delay was not unnecessary, State v. Plouffe, supra. Here, the defendant does not contend any more than that the authorities "could have" presented him earlier. He fails to address the fact that various charges were being raised against him, investigated, and then some of them dropped. During this short period of time the Louisiana authorities had the right to keep him in custody, but their investigations had yet to produce a charge upon which the defendant could be presented. Furthermore, the period of time involved was not so long as to create any presumption of unreasonableness. We hold that the first element of _Benbo_ was not met and that the defendant's statements should not be suppressed on this ground.

As to the above point, the State contends that the _Benbo_ rule should not be applied here because defendant was incarcerated in Louisiana and at that time subject to Louisiana law. The State points to Art. 230.1. of the Louisiana Code Crim.Proc. (West 1967), which provides that

authorities have a seventy-two hour period before they are required to bring a suspect before a judge. In that statute, the remedy for the failure to do so is the release of the suspect. The statute specifically provides that a violation thereof does not require the automatic suppression of incriminating statements.

The general rule is that, as to questions of evidence, the law of the forum controls, 16 Am.Jur.2d, Conflict of Laws §131. This question is best characterized as being one of an application of the exclusionary rule, i.e. a rule of evidence. Thus Montana law should control. The State proposes that what actually is involved here is an application of substantive law, in which this Court should apply Louisiana law. This argument is not compelling for two reasons; first, the remedy requested by the defendant is not a remedy provided for by Louisiana law, but rather is a remedy provided by Montana evidence law; and secondly, we feel that whenever possible, defendants should be entitled to the fullest protection of Montana law when appearing in its courts.

Finally, the defendant argues that the State failed to meet its burden of proving that the statements made by the defendant were voluntary. As stated above, when a defendant shows that his incarceration was initially illegal, the burden shifts to the State to show that the Fifth Amendment was not violated.

In State v. Camitsch (Mont. 1981), 626 P.2d 1250, 1253, 38 St.Rep. 563, 565, we stated:

> "In determinining whether a confession should be suppressed, the trial judge must decide whether or not it was voluntary. [Citation omitted.] The determination of voluntariness depends

> upon the 'totality of the circumstances,'
> with the burden of proof on the State to
> prove voluntariness by a preponderance of
> the evidence."

See also State v. Mercer (Mont. 1981), 625 P.2d 44, 47, 38 St.Rep. 312, 315; State v. Allies (Mont. 1980), 621 P.2d 1080, 1086-87, 37 St.Rep. 2089, 2097. The issue of voluntariness is largely a factual question committed to the district court's discretion. We will not reverse that court if its order is supported by substantial credible evidence, State v. Davison, supra, at 439, 614 P.2d 493; State v. Grimestead, supra at 29, 598 P.2d at 202. This case is especially one where the resolution of the voluntariness issue turns on the credibility of witnesses, and this Court "must defer to the district judge who is in a superior position to judge the credibility of [those witnesses] . . . " State v. Camitsch, 626 P.2d at 1253, 38 St.Rep. at 566.

One factor, not conclusive, supporting voluntariness is the presence of timely and complete Miranda advisements prior to the incriminating statement, State v. Allies, supra at 112, 606 P.2d at 1050. The record indicates that the defendant received ten Miranda warnings between January 4 and January 11. Eight of these advisements and associated waivers were directly related to questioning in connection with the Nees murder. The defendant signed several waivers thereof. There was no evidence adduced that the defendant possessed less than average intelligence, or that by reason of mental impaiment he was incapable of understanding the Miranda warnings. Sergeant Via and Commander Calhoun both testified that the defendant appeared calm, coherent and free from the influence of intoxicants during any of the

22

interviews. The questioning sessions were not long, arduous, or designed to take advantage of the defendant's situation or fatigue. Via and Calhoun testified that no promises of benefit or threats of harm were made to the defendant. Particularly, defendant's allegation, disputed by Calhoun and Via, concerning Calhoun's "fry" comment was obviously not credited by the District Court.

Furthermore, and most importantly, defendant made a statement on January 11 in the presence of his attorney and after opportunity to confer with him. Presumably, the Louisiana attorney had advised the defendant of his rights and consequences of waiving the same, and was diligent in protecting the defendant from coercion. The defendant has made no allegation that his Louisiana attorney failed in this regard and thus we have little difficulty holding that this confession was voluntary.

On this point, the District Court found "The statements of the defendant were voluntary" and "the voluntariness of the statements was obvious." The totality of the circumstances indicates the District Court did not err.

## Issue #4

Defendant argues that due process requires that a conviction of deliberate homicide must be based on an information that charges, and instructions to the jury that require, a finding that the defendant possessed the specific mental state to kill the victim; in other words, that the element of mens rea is constitutionally required. He contends that the statutory element of purposely and/or knowingly does not satisfy this requirement.

23

This Court has previously addressed and resolved this question. In State v. Powell (Mont. 1982), 645 P.2d 1357, 39 St.Rep. 989, we rejected this argument. See also State v. Lemmon (Mont. 1984), 692 P.2d 455, 41 St.Rep. 2359; and State v. Weinberger (Mont. 1983), 665 P.2d 202, 40 St.Rep. 844. The scienter element of section 45-5-102(a) defines the crime of deliberate homicide with sufficient specificity to obviate any claim of unconstitutional vaugueness. State v. Sharbono (1979), 175 Mont. 373, 563 P.2d 61.

## Issue #5

The defendant received the maximum allowable sentence, one hundred years, and was determined to be ineligible for designation as a non-dangerous offender, or parole. Defendant argues that this sentence was not based on any credible evidence presented at the sentencing hearing, or contained in the pre-sentence report, but rather was motivated by the District Court's desire for vengence on behalf of the victim's family. The District Court stated that it imposed this onerous sentence because of its belief that defendant should be removed from society.

In either case, defendant argues that this is violative of Article II, section 28 of the Montana Constitution, which requires that "laws for the punishment of crime shall be founded on the principles of prevention and reformation"; and section 46-18-101, MCA, which provides that the policy behind sentencing is the rehabilitation, if possible, of convicts. In the defendant's mind, his sentence was not based on any principle of prevention, reformation, or rehabilitation, and thus an abuse of discretion by the District Court.

We find no merit in defendant's argument. First, Article II, section 28, Mont. Const. allows a district court in its discretion to base a sentence upon the principle of prevention of future crimes. This includes the power to remove a person from society, as the District Court found necessary here.

Secondly, the District Court's sentence was within the permissible statutory range, and, in the absence of clear abuse of discretion is properly reviewed by the Sentence Review Division. There was no clear abuse of discretion in this case and thus this is a matter for the Sentence Review Board. See State v. Watson (Mont. 1984), 686 P.2d 879, 41 St.Rep. 1452; and State v. Holmes (Mont. 1983), 674 P.2d 1071, 40 St.Rep. 1973.

The judgment and sentence are affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

25

Mr. Justice John C. Sheehy, specially concurring:

I agree with the result.  The question of voluntariness is ended in the fact that Beach confessed in the presence of his attorney.  All the other issues fade in that fact.

_____
                 Justice

26